IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| CIVIC PARTNERS SIOUX CITY, | ) | |
| LLC, | ) | Bankruptcy No. 11-00829 |
| | ) | |
| Debtor. | ) | |

## RULING ON MOTION TO RECONSIDER

This matter is before the Court on the Motion of Debtor, Civic Partners Sioux

City, LLC, to Reconsider the Court's (1) Order Denying Motion to Establish that the

Main Street Lease is Revoked, Not "Unexpired" and (2) Order Granting Motion for

Order Regarding Status of Amended and Restated Lease filed by Main Street

Theaters.   Main Street resisted the Motion to Reconsider.   The Court held a

hearing on the Motion in Sioux City, Iowa.   A. Frank Baron and Robert Marticello

appeared for Movant.   Richard Jeffries appeared for Main Street Theaters.   After

the hearing, the Court took the matter under advisement.   The parties filed

supplemental briefing in October 2012.   This is a core proceeding under 28 U.S.C.

§ 157(b)(2)(A) and (O).

## STATEMENT OF THE CASE

Debtor asks the Court to reconsider an oral, expedited ruling it made in July

2012.   That ruling determined which lease of two leases – an original lease or an

amended lease – governed the relationship of the parties for purposes of this

bankruptcy case.   Debtor argued that Debtor terminated the amended lease before

bankruptcy, and that the termination properly reinstated the original lease.   Main

Street argued Debtor failed to properly terminate the amended lease and/or did not

have authority to do so.   Main Street asserted the amended lease remains in effect.

The Court heard this issue – which would otherwise be a confirmation issue – out of

order on an expedited basis at the request of the parties.   The Court ruled that the

amended lease governed because Debtor did not properly terminate the lease.   The

Court ruled the termination paragraph of the amended lease was for all intents and

purposes a provision allowing rescission, and Debtor did not properly rescind.   In

particular, the Court held Debtor did not refund a $200,000 payment Main Street

made to get the amended lease agreement.   The Court also made an alternative

ruling that Debtor did not have proper authority to terminate the lease without its

lender's consent – which it did not have.

　　　Debtor moved for reconsideration, arguing the Court misapplied Iowa law on

rescission by not allowing Debtor a credit or offset against the $200,000 for the

benefits it provided to Main Street under the amended lease.   Debtor also argued it

discovered new facts indicating there was no need for an expedited resolution of this

issue and that the Court should vacate its ruling and set the matter over for

2

confirmation.   Debtor also asserts that the Court failed to address several of

Debtor's alternative arguments including reformation, equitable estoppel, and

equitable fraud.

Main Street resisted and argued the Court correctly determined the matter in

its ruling and there is no basis for reconsideration.   For the following reasons, the

Court denies reconsideration and concludes that it did not misapply Iowa law on

rescission, the newly discovered facts are irrelevant, and the alternative arguments

are inapplicable to this issue and/or are reserved for the confirmation hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

This matter – and others pending before the Court in this bankruptcy – has a

long and troubled history.   Many of those facts are necessary to understand the

context of this particular dispute.

Debtor became involved with a project that was part of an effort by the City of

Sioux City, Iowa, to redevelop its Historic 4th Street area.   Debtor became the

owner of a business complex in that historic development area.   The business

complex housed a multiscreen movie theater that was run by Main Street Theaters.

The movie theater was intended to be the anchor tenant in the project, with other

retail and entertainment space to be leased to complement the theater.

Key parts of that deal included a development agreement and promissory note

Debtor signed with the City in 2003, and the lending/first mortgage agreement

Debtor signed with First National Bank ("the Bank") in 2003.

Main Street signed the original lease with Debtor in 2004.   Debtor agreed to

develop the property by bringing in other tenants that would complement the theater

and that Debtor would maintain the property.

Nearly from the beginning, Main Street had a difficult time making rent

payments.   Main Street began to accumulate a large rent deficiency.   Main Street

complained that Debtor had failed to properly develop the project as promised

because the other tenant spaces were vacant and were simply enclosed with dirt

floors.   Main Street also complained that Debtor failed to properly build or maintain

the premises and/or to provide suitable, water tight, space.   Main Street regularly

had water pour into the theater in different places with up to an inch and a half on the

ground at times.

Debtor was unable to keep up on its payment obligations with the Bank.

Debtor had not been able to lease many of the other retail spaces.   In fact, it had

only one other tenant in the project – a small retailer.   Debtor admitted that it left the

other spaces largely unfinished – enclosed with dirt floors.   Debtor complained that

improvements promised by the City were not correctly built and caused many

4

problems for the property – mostly related to water damage from drainage into instead of away from the project.   Debtor and Main Street reached an informal rent agreement.   Main Street would pay whatever it could as all the parties tried to address the problems and move the project forward.

The problems festered over the years.   In the summer of 2009, the parties engaged in a two-part "global" mediation to attempt to resolve all of their disputes. The first part of the mediation was in Sioux City, Iowa.   All parties attended.   The second mediation meeting was held later in Omaha, Nebraska.   All parties except the City attended.   The parties reached a global agreement pending acceptance/ratification by the City.

The proposed mediation agreement called for a restructuring of several of the contracts, including the lease at issue here.   The proposed agreement called for an amended lease between Debtor and Main Street that settled up many of their disputes.   It provided for a smaller monthly rent payment, a mutual release of the parties' claims against each other, and a $200,000 "restructuring payment" from Main Street to Debtor as consideration for the agreement.   The mediation agreement also contemplated a reworking of Debtor's agreement with the Bank to help Debtor manage payments.   The mediation agreement also contemplated a

reduction in the City's assessment of the property and the related tax Debtor paid to and owed to the City.

As the City reviewed and analyzed the proposed mediation agreement, it identified several issues that Debtor needed to resolve before the agreement could be brought before and ratified by the City Council.   There is much disagreement about what the issues were and how they were handled.   However, one thing the parties agreed to do – hoping it would help the overall process – was to get the amended lease between Debtor and Main Street in place.   Discussions on the amended lease began in September 2009.

As noted, the amended lease attempted to resolve outstanding issues between Debtor and Main Street, and to get a steady rent flowing.   It contained a mutual release of liability to move beyond arguments about Debtor's insufficient management and operation of the property and Main Street's failure to make full rental payments.   It contained two paragraphs that are critical to this case:

> In **consideration** of Landlord entering into this Lease, Tenant shall pay to First National Bank, on account of Landlord, the sum of **$200,000** in immediately available funds (the "**Restructuring Payment**") as follows: (i) $150,000 on the Effective Date and (ii) $50,000 on or before December 15, 2009. The Restructuring Payment is an obligation of Tenant **separate and distinct from all other obligations of Tenant** under this Lease **and shall not be a credit against, or otherwise on account of any Minimum Annual Rent, Percentage Rent, Additional**

6

**Rent** or any other sums payable by Tenant to Landlord
pursuant to this Lease.

Amended and Restated Lease, ¶ 30.23 (emphasis added).

Conditions Precedent.   Landlord's obligations under this
Lease are conditioned upon Landlord obtaining (each
being a "Condition") definitive agreements:   (i) from the
City of Sioux City restructuring Landlord's existing
indebtedness with the City of Sioux City and real estate
taxes for the Project as more fully described in Article IV
of the Principal Terms and Conditions of Proposed
Mediated Settlement Agreement executed by Landlord,
Tenant and First National Bank and dated August 13,
2009 which is incorporated herein by this reference (the
"Mediation Agreement"), (ii) from the City of Sioux City
to remedy the Outside Construction Defects at the City of
Sioux City's expense, (iii) from First National Bank
restructuring Landlord's existing indebtedness with First
National Bank for the Project as more fully described in
Article III of the Mediation Agreement and (iv) from
Liberty National Bank restructuring Landlord's in Article
V of the Mediation Agreement.   If Landlord is unable to
satisfy any one or more of the Conditions on or before
March 15, 2010, Landlord shall have the right (but not the
obligation) until and including March 31, 2010 to declare
this Lease null and void with written notice to Tenant.
Upon such declaration by Landlord, the Original Lease
shall be deemed reinstated by the parties as if this Lease
was never entered into and all payments by Tenant under
this Lease shall be applied to the Original Lease.

Amended and Restated Lease, ¶ 30.24 (Fifth Amendment).   Debtor and Main Street

completed and signed the amended lease in November 2009.   Its effective date was

September 2009.   The base rent was $900,000 annually.

7

Shortly after Main Street and Debtor executed the amended lease, Debtor and

the Bank started to restructure their agreement.   On November 25, 2009, they

executed an Amended and Substituted Assignment of Debtor's Interest in Lease and

Rents (amended assignment).   The amended assignment provides in part:

> . . . Borrower does hereby ABSOLUTELY,
> UNCONDITIONALLY AND IRREVOCABLY
> GRANT, SELL, CONVEY, ASSIGN, TRANSFER, SET
> OVER AND DELIVER UNTO Lender the following:
>
> > (a) All right, title and interest of Borrower, whether as
> > a lessor or a lessee, in and to all leases, . . . together
> > with (subject to the terms of the Loan Agreement) all
> > the right, power and authority of Borrower to alter,
> > modify or change the material terms of such leases,
> > subleases, occupancy agreements and concession
> > agreements or to surrender, cancel or terminate such
> > leases.
>
> > 3. Borrower's Covenants and Agreements. Borrower
> > covenants to and agrees with Lender as follows:
>
> > (a) Amendment and Modification.   Borrower shall
> > not enter into, materially modify or amend, renew,
> > extend, surrender, or terminate (other than due to a
> > default thereunder) any Lease or reduce or abate any
> > rent due under any Lease, nor shall Borrower consent
> > to any assignment, subletting or other transfer of any
> > Lease by any Lessee (other than a renewal or
> > extension to which a Lessee is entitled under the terms
> > of an existing Lease or contained in a lease that is
> > subsequently approved by Lender) unless Borrower
> > first obtains the prior written consent of Lender, which
> > consent shall not be unreasonably withheld or delayed.

8

ECF Doc. #223, First National Bank's Brief at 3.   The Bank points out that under this amended assignment – like the original assignment Debtor provided to the Bank in 2003 — the Bank had the absolute right to approve or disapprove of Debtor's attempts to alter, amend, or terminate its lease with Main Street.

While these new agreements were being negotiated and executed, the City was still considering whether to approve the settlement agreement.   By early December 2009, it became apparent the City would not approve the settlement.

Debtor did not immediately seek to cancel or terminate the lease under paragraph 30.24.   Instead, it requested several extensions of time to make the decision while the parties negotiated further and explored other options.   Main Street granted all of Debtor's extension requests.

On December 7, 2010, a year after the settlement collapsed, the Bank filed a petition seeing to foreclose on Debtor's property.   The Bank noted Debtor's continuing defaults and requested foreclosure, a money judgment, and for appointment of a receiver to collect the rents.   On January 5, 2011, Debtor filed an answer and counterclaim.   The answer admitted Debtor was in default and that the mortgage and assignments with the Bank, "speak for themselves."   In its counterclaim, Debtor made claims for tortious interference with existing contractual relations against the Bank.   It accused the Bank of inequitable conduct, including

fraud in dealing with the parties.   That case was removed to this Court after Debtor

filed bankruptcy.   The Bank's Motion for Summary Judgment in that case is

pending and will be decided with this issue.

On January 14, 2011, the City also filed a claim against Debtor for breach of

the development agreement and money owed to the City.   Debtor counterclaimed

for the construction defects in the City's promised improvements.

On March 10, 2011, Debtor sent a letter to the Bank, and copied Main Street,

requesting the Bank to consent to Debtor's termination of the amended lease with

Main Street.   On March 14, 2011, the Bank responded with questions to Debtor

about how this would affect the Bank's interest in rents.

On March 30, 2011, without the Bank's consent, Debtor sent Main Street a

letter purporting to terminate the amended lease under paragraph 30.24 of that

document.   Main Street did not believe the letter alone terminated the amended

lease.   Main Street continued to make payments under the terms of the amended

lease — the $900,000 annual rent.   Debtor did not repay the $200,000 restructure

payment to Main Street.   Debtor never offered to restore the "status quo" that

existed before the amended lease took effect.   Debtor never made any attempt to

address the status quo, and provided no explanation of why it was keeping the

$200,000.   Debtor made no further demands on Main Street for lease payments

10

under the "original lease."   It continued to receive the rent payments at the

$900,000 annual amount set in the amended lease.

Debtor filed for bankruptcy on April 14, 2011.   Main Street has continued

making payments of the $900,000 rent set out in the amended lease.   Debtor

removed both the state court cases involving Debtor – (1) The Bank's foreclosure

and money judgment claim and Debtor's Counterclaim; and (2) the City's claim and

Debtor's counterclaim – to this Court in the summer of 2011.

On October 27, 2011, the Bank moved to dismiss or convert the case.   On

November 18, 2011, Debtor filed its Plan of Reorganization.   The Plan specifically

stated that it wanted "the Court to rule that the bank has sequestered $5.0 million or

more in unpaid theater rent from Main Street Theatres and future rent due from the

original theater lease **which the bank has prevented Civic from restoring** by

refusing to consent to Civic's revoking the amended lease."   ECF Doc. #97,

Original Plan of Reorganization at 8 (emphasis added).   The Plan asked for

equitable subordination of the claims of the Bank and the City for what the Plan

describes as inequitable, fraudulent, and/or tortious conduct by the Bank and the

City.

On November 28, 2011, Debtor resisted the Motion to Dismiss, noting it had

now filed a Plan.   The Court heard the motion on December 9, 2011 and denied it

11

largely because Debtor had filed a Plan.

The Bank filed a second Motion to Dismiss on December 22, 2011.   It argued the Debtor's Plan was not feasible on its face and that Debtor had yet to file a disclosure statement.   The Bank noted Debtor had admitted it did not have positive cash flow, was continuing to deplete the estate, and had no reasonable likelihood of reorganization.

The Bank also specifically noted the unrealistic assumptions the Plan made regarding its relationship with Main Street.   In particular, the Bank stated that the Plan was built on the unrealistic assumption Main Street would continue as a paying tenant while being sued by Debtor for five million dollars of unpaid "back rent" under the original lease.   The Bank also pointed out the Plan further assumed the unlikely scenario that Main Street would not assert counterclaims against Debtor and that Debtor would prevail unconditionally in its collection of full back rent from Main Street.   The Bank characterized this all as "magical thinking."   The City joined the Bank's Motion to Dismiss.

Main Street filed a request to participate in the hearing on the Motion to Dismiss, which in effect became a joinder in the Motion.   Main Street joined the Bank's arguments and also asserted another reason the Plan was not feasible — Debtor had released Main Street from its back rent obligations in the amended lease

12

which still governed.   Main Street pointed out the amended lease specifically

contained a "mutual release" of all claims it and Debtor had against each other.

Main Street further pointed out that Debtor's assertions in the Plan that the amended

lease was never consummated were false because Debtor accepted the $200,000

restructuring payment and had continuously received the $900,000 annual rent

under the amended lease.   Main Street acknowledged that the amended lease

allowed the "back rent" to be reinstated under certain conditions, but argued those

conditions never occurred.   Main Street argued that the enforceability of the

amended lease was a key reason Debtor's Plan was not feasible.

Debtor filed an objection to the Motion to Dismiss.   Debtor asserted a

number of errors in the Bank's arguments.   Debtor also asserted for the first time,

through its principal, Steve Semingson, that it intended to make a substantial new

value contribution.   Debtor indicated it was preparing a new plan that outlined those

terms.

Debtor argued further in its objection to dismissal that it now had a positive

cash position.   Debtor specifically noted it received rent, during the case, "in the

annual base amount of $900,000 **pursuant to the <u>Amended and Restated Lease</u>**

by and between the Debtor and the Tenant (the "Amended Lease").   ECF Doc. 136

at 4 (emphasis added).   Debtor also pointed out that it believed it had a viable claim

13

against the Bank for tortious interference with Debtor's contractual relationship with

Main Street.   Debtor claimed that the Bank "mislead the Debtor into releasing its

claim against [Main Street] for past due rent."   Id. at 5.   Debtor also asserts that

because of that it "**holds claims to terminate the Amended Lease** and to pursue the

Tenant for past due rent under the original lease agreement among the parties…" Id.

Debtor also noted it had "cash flow projections demonstrating the Debtor's ability to

generate sufficient income, based on **the current rent the Debtor is receiving**

**under the Amended Lease**..." to service creditor claims.   Id. (emphasis added).

Debtor – in a footnote to this assertion stated:

> As discussed above and in the Plan, the Debtor believes it
> has claims to terminate the Amended Lease and to pursue
> the Tenant for past-due rent now totaling approximately
> $5 million. Notwithstanding the foregoing, the Debtor has
> assumed that it will continue to receive the rent under the
> Amended Lease as it has post-petition for purposes of its
> projections. However, nothing herein shall be construed as
> the Debtor's agreement to be obligated under the
> Amended Lease. The Debtor reserves all rights with the
> respect to the Amended Lease and the original lease
> between the parties.

Id. at 6.

Debtor also refers in its objection to dismissal to the current obligations under

the amended lease in rebutting the Bank's claims of the Debtor's improper

maintenance of the property.   Debtor claims it had indeed made the repairs, but then

14

states:   "Moreover, pursuant to section 15.1 of the **Amended Lease, the Tenant is**

**required** to maintain and repair the property at its own expense."   <u>Id</u>. at 8

(emphasis added).   Debtor then attaches the amended lease to prove that point.

Debtor then twice more emphasizes that its projections "are based on Debtor's

current income that it is actually receiving from [Main Street] **under the Amended**

**Lease**…" and that "the projections demonstrate that the **rent under the Amended**

**Lease** is sufficient to service the reduced amount of secured debt."   <u>Id</u>. at 11

(emphasis added).

The Court held a hearing on the Motion to Dismiss in Sioux City, Iowa on

February 22, 2012.   As part of the hearing, the parties had moved for the Court to

make a viewing of the premises.   The Court granted the motion and did the viewing

along with all parties at the beginning of the hearing.   The Court and parties then

returned to the courtroom for evidence and argument.

A number of issues were addressed — a few of them directly relevant here.

Those included the continuing problems with the building, lack of even a "vanilla

shell" finish in vacant space, the likelihood of filling the spaces with complementary

tenants, and Main Street's ability and desire to remain in the project.   The main

concerns witnesses addressed about Debtor's continuing maintenance and repair

issues at the property focused on water leakage into the theaters (of an inch or more

15

standing water at a time) and related damage to the theater and exterior parts of the

building.   Debtor did not rebut that testimony but noted that the "vanilla shell"

finishes for most vacant spaces would be completed soon.

Main Street presented its evidence through its owner, William Barstow.   He

testified that Main Street was essentially facing two categories of issues.   The first

was his need to make a decision on acquiring financing for conversion of the theaters

from film to digital projection.   Financing incentives from the film studios were

available but also time sensitive.   He needed assurances on several fronts before he

could and would get financing.   Conversion to digital format is a critical issue as it

relates to competitiveness and ability to get the best movies.   Main Street was under

the gun for that decision and noted it was a major issue that would affect its decision

on whether to remain as a tenant.   Barstow specifically stated Main Street could not

and would not make the digital conversion or remain as a tenant if Debtor continued

to pursue back rent.   Barstow also noted that in calculating the alleged back rent

Debtor did not account for Main Street's significant defenses.   Barstow noted in

particular that the defenses related to the water issues, property condition, and

failure of Debtor to deliver on promises of complementary tenants.   Barstow

asserted that those issues significantly affected his business and the value of rent in

the original lease and would be the basis for significant claims to offset any "back rent" pursued.

Barstow noted that the mediation that resulted in the amended lease made his operation viable.   He noted that he paid the $200,000 restructuring payment to get the amended lease and noted that both parties had explicitly released their claims against each other to get the deal in place.   He believes the amended lease remains in place because Debtor did not properly terminate it.   He has never gotten his $200,000 back, and it was never even offered by Debtor.   He has continued to pay the $900,000 annual rent to Debtor.

Debtor provided its evidence primarily through its principal, Steve Semingson.   Semingson also appeared in his own capacity and retained separate counsel.   Debtor and Semingson, however, presented their testimony and evidence jointly and indicated their views were consistent on all subjects.   The focal point of Semingson's testimony was the "new value" contribution he suggested he would make in his objection to dismissal.   He stated that he and his entities had liquidity of up to $1,200,000.   He indicated they would and could contribute whatever it took to make the business work if it was a good business decision.

Semingson asserted that it was Debtor's belief the amended lease was terminated before bankruptcy.   He asserted Debtor is entitled to full back rent under

17

the original lease.   He noted he may or may not pursue the back rent and that

decision would depend upon the content of any agreement all the parties could

reach.   On cross examination he was forced to admit that the $900,000 in annual

base rent Debtor was receiving under the amended lease was actually significantly

more than Debtor was receiving from Main Street before the mediation and

amended lease.   He admitted he was using the $900,000 rent from the amended

lease as a key figure in his projections to show the Plan was feasible and the case

should not be dismissed.

After the evidence and argument, the Court and the parties discussed the

status.   The Court inquired about the need for, or utility of, a court sponsored or

court ordered settlement proceeding.   The parties noted the new value promises and

new plan concept was a good change in the direction of the case.   The consensus

was that settlement might be realistic given the developments, but that the new plan

with the new value specifically outlined should be filed and reviewed by the parties

before again addressing settlement issues.   Debtor agreed to attempt to expedite

that filing of the new Plan but noted the need for an appraisal before any decision on

the proper amount of new value was discussed.   The Court agreed that it would

revisit the settlement discussion at the time the new plan was filed.   It took the

Motion to Dismiss under advisement but indicated it likely would not dismiss if things progressed as outlined.

Debtor filed the Amended Plan on May 17, 2012.   On the same day, Debtor filed a Motion seeking to expedite the plan confirmation process, which included a specific motion to order the parties to mediation before the confirmation hearing. The City, the Bank, and Main Street all objected.   The Court held an expedited hearing on May 25, 2012.   After discussion of the confirmation and disclosure statement issues, the parties seemed to achieve consensus on a schedule that would not require a separate disclosure statement hearing.

The remainder of the hearing was on the request by Debtor that the Court order a settlement conference or mediation.   The creditors basically all agreed they were disappointed with the Amended Plan and found the new value contribution suggested ($150,000) to be seriously inadequate.   However, the conversation shifted to what needed to happen to have a meaningful discussion about settlement. Main Street pointed out its need for a quick decision on whether the amended lease or original lease (and accompanying back rent claim) would govern this case.   Main Street noted it needed the quick decision because an important date – July 10, 2012 — was fast approaching on that issue.   Counsel for Semingson stated that the Court might be able to decide this issue out of order on an expedited basis to break the log

19

jam.   Instead of waiting for a confirmation hearing where this would normally be heard, he suggested a stand-alone hearing on an expedited basis to get this issue decided quickly.   The Court agreed to do so.   In an Order dated May 29, 2012, the Court set a hearing for June 21, 2012 "to determine whether the Amended and Restated Lease dated September 1, 2009, is 'unexpired' for purposes of 11 U.S.C. section 365 and is subject to assumption or rejection…." ECF Doc. #189.

A flurry of activity occurred between the Order and the scheduled hearing. On June 1, 2012, Debtor filed a Motion to Establish that the Main Street Lease is Revoked.   With the motion, Debtor filed a Memorandum of Law on Equitable Fraud pointing to the Bank's alleged inequitable conduct in its dealings with Debtor after the 2009 mediation.   This argument reasserted much of what it said in the original Plan regarding the Bank unfairly preventing Debtor from canceling the amended lease.   Much of that argument and the facts related to it are the subject of Debtor's counterclaim pending in the Bank's adversary – which is subject to a separate dispositive motion.

On June 6, 2012, Main Street filed a Motion for Clarification of the Purpose and Scope of the June 21, 2012 Hearing.   It requested an expedited hearing.   Main Street pointed out that in the May 25, 2012 hearing the parties agreed the hearing would be short, confined to issues about which lease governed, and the equitable

issues related to the Bank would not be a part of it.   On June 7, 2012, Main Street

filed its own Motion on the issue – Motion for Order Regarding Status of Amended

and Restated Lease.

On June 8, 2012, the Court held the expedited hearing Main Street requested.

The Court agreed with Main Street that the lease hearing would be limited in scope

and would not include the equitable issues raised in the adversary or the related

equitable subordination arguments.   Debtor for the first time – contrary to its

position on May 25, 2012 – noted that it was unsure whether those issues could be

separated.   The Court offered Debtor a chance to call off the whole agreement to

have an out-of-order expedited hearing on the lease issue.   Debtor decided to go

ahead but asked the Court to be open to deciding, after hearing all the evidence, that

the lease issues were too intertwined with the equitable issues and deferring any

ruling on this issue until confirmation.   Everyone agreed to this suggestion and to

move forward.

On June 18-19, 2012, the City and Bank both filed a Motion to Quash

Subpoena served by Debtor.   They asked for expedited hearing because a ruling

would affect the scope of the issues for the lease hearing on June 21, 2012.   Main

Street joined the objections.   Debtor resisted.   The Court held another expedited

hearing on June 19, 2012 to address these issues.   The Court granted the motions to

quash, reiterated the limits on the hearing, and offered Debtor – and the other parties – another chance to simply call off the hearing if those terms were not acceptable. They all agreed to proceed.

The Court held the hearing on which lease governed in this case on June 21, 2012 in Sioux City, Iowa.   It went well beyond the time allotted.   Much of the hearing focused on whether Debtor needed the Bank's consent to terminate the lease.   This led to several additional interruptions in the testimony for relevance objections related to the question of the Bank's inequitable conduct. At one point, Debtor's counsel complained that the Court's restrictions on the hearing were making it difficult to present the issue.   The Court pointed out the numerous proceedings where the issue had been discussed, Debtor was offered a chance to decline the hearing, and Debtor chose to proceed.   The Court then offered Debtor another chance to call off the hearing right then and there.   Debtor again declined and agreed to proceed under the limited scope the Court required.

Three witnesses testified.   Steve Semingson for Debtor, William Barstow for Main Street, and Troy Heitman for the Bank.   Their testimony largely focused on the meaning and effect of two documents – the amended lease and the amended assignment to the Bank of Debtor's interest in the lease and rents.   Semingson testified Debtor signed the two documents only as part of what was supposed to be a

22

larger deal.   The deal involved significant participation from the City and hinged on the City's approval of the deal.   He believed both documents were or could be canceled when the City did not approve the deal.   He believed both documents were eventually properly canceled.   He noted the cancellation deadline for the amended lease was extended many times while more negotiations played out, but that Debtor eventually canceled within the allowed extended time.

Semingson admitted that Debtor wrote the Bank on March 10, 2011, to request its consent to Debtor's termination of the amended lease.   He admits Debtor never got the Bank's consent.   Debtor nevertheless sent Main Street a letter on March 30, 2011 purporting to cancel or terminate the amended lease.   He admits Debtor never restored or offered to restore the status quo with Main Street that existed just before the amended lease was executed.   He admits Debtor never returned or offered to return the $200,000 restructuring payment to Main Street.   He believed that under the amended lease terms Debtor could and did credit that $200,000 against back rent owed under the original lease.

The main point of Semingson's testimony was that Debtor entered into the two post-mediation agreements only as part of a larger deal that never materialized. He believed Debtor reserved the right in both agreements to terminate them if Debtor did not get the benefit of the full mediation agreement.   He claims the

23

amended lease was canceled for that reason and that it would be unfair to hold

Debtor to that amended lease without the full mediation agreement – and its

additional benefits to Debtor – in place.   On cross examination, he essentially

admitted that the $200,000 Main Street paid was never returned and was credited

against Debtor's debt to the Bank.

William Barstow testified that Main Street paid the $200,000 as

"consideration" for Debtor to do the "restructuring" as the amended lease

specifically noted.   He pointed out the $200,000 was not treated as rent – and that

the amended lease contained a separate provision — 30.23 — that made that clear.

> . . . The Restructuring Payment is an obligation of Tenant
> separate and distinct from all other obligations of Tenant
> under this Lease and shall not be a credit against, or
> otherwise on account of any Minimum Annual Rent,
> Percentage Rent, Additional Rent or any other sums
> payable by Tenant to Landlord pursuant to this Lease.

Amended and Restated Lease, ¶ 30.23.   He testified there was no agreement or

understanding that Debtor could keep the $200,000 if the mediation agreement fell

through.   He pointed out again that the amended lease contained a mutual release

clause that caused Main Street to give up its defenses to Debtor's back rent claim.

He believes those defense would have substantially reduced the amount of rent

properly chargeable under the original lease.   He noted that Main Street has

continued to pay the $900,000 annual base rent under the amended lease since it

24

took effect — up to the present date.   He notes that he could not afford to pay the

amount of back rent purportedly due – or the higher rent going forward – under the

original lease.   He did not believe the rental space was worth the amount charged in

the original lease given all the problems and deficiencies in the space.

Troy Heitman testified for the Bank.   He stated the Bank never provided

consent to terminate the amended lease.   He pointed out the amended and original

assignments the Bank executed with Debtor gave the Bank the unequivocal right to

require its consent before any lease termination.   He also pointed out, however, that

the Bank actually never withheld its consent – as Debtor suggests.   He points out

that the Bank responded to Debtor's March 10, 2011 letter requesting consent with a

letter back to Debtor dated March 14, 2011.   That letter simply asked for more

information and was not a refusal of consent.   He acknowledged that the 2009

amended assignment required that the Bank not "unreasonably withhold" its

consent.   He asserts that the questions in the March 14, 2011 letter show the Bank

was making reasonable requests for information — not unreasonably withholding

consent.   He also noted, however, that Debtor has asserted the 2009 amended

assignment is void because the City did not approve the mediation agreement, which

would leave the original 2003 assignment in place.   He noted that under that

original assignment, there was no requirement that the Bank not "unreasonably

withhold" its consent.    The original assignment provided no limitation at all on the Bank.

The parties agreed to simultaneous expedited briefing to allow the Court to make a decision before Main Street's July 10, 2012 deadline.    Briefs were filed on June 28, 2012.    On Friday, July 6, 2012, the Court held a telephonic hearing to announce its decision only – without the rationale or other parts of the ruling – so Main Street could have more time before its deadline to act.    The Court found the amended lease was not terminated and it applies for purposes of this case.    The Court scheduled another telephonic hearing on Monday, July 9, 2012, to provide its full oral ruling and supporting rationale.

On July 9, 2012, the Court provided a lengthy oral ruling – resulting in a 40 page transcript.    ECF Doc. 266.    The summary of that oral ruling is as follows. The Court spent the vast majority of the ruling (30 pages or so) summarizing the factual and procedural background and doing a contract interpretation analysis under Iowa law.    In short, the Court rejected Debtor's interpretation that the amended lease allowed debtor to keep the $200,000 upon termination and credit it against rental payments due under the original lease.

The Court then came to the part of the analysis that is relevant to the pending Motion to Reconsider.    The Court found paragraph 30.24 of the amended lease,

which allowed but did not require Debtor to declare the amended lease terminated,

essentially incorporated and was consistent with Iowa law on rescission of contracts.

The Court then specifically held Debtor did not properly rescind the amended lease

because Debtor never restored or offered to restore the status quo between Debtor

and Main Street that existed before they executed the amended lease.   In particular,

the Court pointed out that the failure of Debtor to return or offer to return the

$200,000 "restructuring" payment to Main Street made Debtor's attempt to rescind

or cancel the amended lease invalid.   The Court noted that Debtor's continuing

dominion and control over what it received in the amended lease (like the $200,000)

effectively waived or withdrew Debtor's attempt to rescind under Iowa law.   The

Court also noted that it was a bit peculiar for Debtor to being arguing that it was not

fair to hold Debtor to the amended lease because Debtor did not get the full

restructuring with all parties that it bargained for, while Debtor at the same time was

arguing it had a right to keep a $200,000 "restructuring" payment from Main Street

for a restructuring Main Street would not get if Debtor canceled the amended lease.

The Court also provided an alternative holding.   It found Debtor needed the

Bank's consent to terminate the amended lease and that Debtor never got that

consent.   The Court concluded this also made the attempt to rescind invalid.   The

Bank's consent was required in both the amended and original assignment of rent

27

and leases so the Court concluded it did not matter which one of those assignments

controlled.    The Court also found that the nature of the relationship of the Bank to

the amended lease between Debtor and Main Street made it more than a mere

incidental third party beneficiary of the amended lease.    The Court noted the Bank's

position in this case was more like an intended or donee beneficiary, which gave it

rights in addition to those that creditors normally have.    This alternative ruling is

relevant to the portion of Debtor's Motion to Reconsider that argues the Court

needed to rule on the equitable issues if it addressed or relied upon this rationale.

Debtor filed the Motion to Reconsider on July 27, 2012.    That motion has its

own lengthy and involved history.    Debtor argued in the Motion to Reconsider that

the Court misapplied Iowa law on rescission of contracts, that there were newly

discovered facts in the case bearing on these issues, and the Court failed to address

Debtor's reformation, equitable estoppel, and equitable fraud arguments.    Debtor

argued that the Court misapplied Iowa rescission law by failing to consider and

apply a mutual restoration of the status quo that also accounted for Debtor's

restoration rights.    Debtor asserted it had offsets against the $200,000 restructuring

payment that the Court failed to address in its ruling.    Debtor asserted that it could

have fully offset the $200,000 against either (1) the $3.2 million in "back rent" that

Main Street owed under the original lease at the time of the restructuring or (2) the

benefit of the "reduced rent" Main Street received under the amended lease for more

than a year and a half before rescission.   Debtor asserted the latter amount — the

value of the reduced rent — for the first time in the Motion to Reconsider and

claimed it was $395,284.21.   Under either of these calculated offsets, Debtor argues

it did not have to restore any of the $200,000 to Main Street and, in fact, Main Street

should have to restore some additional money to Debtor.   Debtor concludes this

alleged offset – articulated and argued for the first time on the Motion to Reconsider

– made the Court's ruling which relied on Debtor's failure to repay or restore the

$200,000 incorrect.

Debtor next argues — in several pages of briefing — that the Court failed to

properly consider Debtor's "reformation of contract" arguments.   Debtor asserts the

reformation arguments were made before the Court's July 10, 2009 Ruling.   Debtor

concedes, however, that it made those reformation arguments only in Debtor's

pre-hearing Reply Brief and only brief places in a post-hearing brief (in a footnote

on one page and as part of a paragraph of another).   Debtor does not argue it made

any "reformation" argument at the hearing.

Debtor also asserts the Court failed to consider Debtor's equitable fraud and

estoppel arguments.   Debtor notes it raised those issues in its first pre-hearing brief

(which spawned the objections to the scope of the hearing) and in post-hearing

briefing.    Debtor claims that the Court could not conclude, as it attempted to do in

its Ruling that the Bank's consent was never provided without ruling on those

equitable issues.    Debtor believes the Bank would and should be equitably estopped

from withholding its consent if the Court looked at the Bank's allegedly fraudulent

and inequitable behavior that included inducing Debtor to sign the amended lease.

Debtor also extensively argued that "newly discovered evidence" requires the

Court to vacate its ruling and hold the lease issue over for the confirmation hearing.

Debtor's newly discovered evidence is that Main Street never acquired or even acted

on the financing that allegedly drove the need for an expedited hearing and decision

by July 10, 2012.    Debtor asserts Main Street may not have needed the Ruling at all

and may never have had a real deadline at all.    Debtor notes that immediately after

the July 10, 2012 Ruling that was in Main Street's favor, Main Street began to

discuss moving out of the theater space instead of getting new digital equipment.

On August 6, 2012, Main Street objected to the Motion for Reconsideration.

The Court held a hearing on the matter in Sioux City on August 13, 2012.    After

hearing arguments and conferring with the parties, the Court determined it would

take the matter under advisement and also reconsider ordering the parties to a

settlement conference.    The Bank voiced its displeasure with the Court's

announced intent to revisit the issue of a court ordered settlement conference.

On August 15, 2012, the Court ordered all parties to attend a mediation and/or settlement conference on or before September 11, 2012.   The Bank filed a Motion to Reconsider.   Debtor resisted.   The Court heard and denied the Bank's motion. In the process of ordering mediation, the Court noted it intended to withhold ruling on all pending motions until after the mediation.

On September 13, 2012, the Court held a post-mediation status conference. The parties noted there were still offers outstanding and requested an additional week to report to the Court.   The Court agreed and held another status hearing on September 19, 2012.   The parties informed the Court the mediation failed and they agreed to move forward on scheduling for confirmation.   The parties also requested and were given additional time to file supplemental briefing on this pending Motion to Reconsider the ruling on the lease.   On October 5, 2012, both Main Street and Debtor again filed extensive supplemental briefing.

## CONCLUSIONS OF LAW AND DISCUSSION

A motion to reconsider "allows the bankruptcy court to correct its own errors, sparing the parties and appellate courts the burden of unnecessary appellate proceedings."   In re Crystalin, LLC, 293 B.R. 455, 465 (B.A.P. 8th Cir. 2003) (citation omitted).   Debtor has asked the Court to reconsiders its ruling for three groups of reasons: (1) error of law by the Court in applying Iowa rescission law; (2)

newly discovered evidence that undermines Main Street's position and requires the

Court to vacate the ruling; and (3) failure of the Court to address some of Debtor's

arguments when it ruled.   The Court will address those arguments in that order.

### 1. **Error in Applying Iowa Rescission Law**

As noted above, Debtor's main argument is that the Court misapplied Iowa

rescission law by failing to require a mutual restoration of rights and benefits which

would have allowed Debtor to offset the entire $200,000 against obligations Main

Street allegedly owed Debtor.   The Court rejects that argument.

Debtor suggests the Court's first error was in applying Iowa rescission law at

all.   The Court disagrees and will quickly address that point.   The Iowa Supreme

Court has recently addressed what "rescission" and "rescind" mean in a contract

setting:

> Black's Law Dictionary defines **rescind** as: "[t]o
> abrogate or **cancel (a contract) unilaterally** or by
> agreement" or "[t]o make void; **to repeal or annul**."
> *Black's Law Dictionary* 1332 (8th ed. 2004). The
> dictionary defines rescind as to do away with, to take
> away, remove, take back, annul, cancel, "to abrogate (a
> contract) by tendering back or restoring to the opposite
> party what one has received from him," and "to vacate or
> make void (as an act) by the enacting or a superior
> authority; repeal." *Webster's Third New International
> Dictionary* 1930 (unabr. ed. 2002).

State v. Stone, 748 N.W.2d 545, 549 (Iowa 2009) (emphasis added).   This is exactly
what Debtor sought to do here.   Debtor sought "to abrogate or cancel (a contract)
unilaterally" or "to make void; to repeal or annul."   Id.   The language of paragraph
30.24 discusses returning the parties to their previous relationship – the status quo
ante. "Restoring the status quo is the goal of the restitutionary remedy of rescission."
Potter v. Oster, 426 N.W.2d 148, 152 (Iowa 1988).

In its oral ruling, the Court concluded not only did this all point to actual
rescission, it noted that contracts must be interpreted in accordance with Iowa law
(which the amended lease specifically adopts at paragraph 30.) unless there is a clear
intent to the contrary.   The Court concluded that in law and in fact the language of
the amended lease and the parties' actions under the lease all pointed toward an
attempt by Debtor to rescind the amended lease.   The Court believes that to be a
correct analysis which provides no reason for reconsideration.

Iowa courts have repeatedly addressed the meaning and application of
rescission.   A brief recitation of the general principles of Iowa rescission law
demonstrates why the Court found Debtor's attempt to rescind to be entirely
ineffective here.   "Rescission is a restitutionary remedy which attempts to restore
the parties to their positions at the time the contract was executed."   Potter, 426

33

N.W.2d at 151.   The focus of the doctrine is restitution and preventing unjust

enrichment:

> the object of restitution is not the enforcement of a
> promise, but rather the prevention of unjust enrichment.
> The focus is on the party in breach, rather than on the
> injured party, and the attempt is to put the party in breach
> back in the position in which he would have been had the
> contract not been made. The party in breach is required to
> disgorge what he has received in money or services by, for
> example, returning the benefit to the injured party who
> conferred it on him. [The restitution interest] is ordinarily
> smaller than either the expectation or the reliance interest.
> Although recovery measured by either of these interests
> takes account of cost incurred in conferring a benefit on
> the party in breach, the restitution interest includes neither
> the injured party's lost profit nor the part of his
> expenditures in reliance that conferred no benefit on the
> party in breach.

Id. at 150 (quoting Farnsworth on Contracts, at 814).

The requirements of rescission are specific:

> Rescission is the unmaking of the contract. Rescission
> may be accomplished by acts In pais, as well as through
> resort to the court of equity; but, in order to accomplish
> rescission In pais for breach of warranty (as well as for
> other causes), there must be, within reasonable time after
> knowledge of the existence of the cause * * *, an election
> to rescind. Within reasonable time, too, knowledge of,
> from unmistakable act or notice manifesting (it), such
> election must be conveyed to the seller * * * and the buyer
> must restore or offer to restore, the status quo. Until
> restoration or offer to make restoration is made, there is
> ordinarily, at law no rescission. (Citing authorities)

> When the buyer rescinds, he renounces the contract and
> his ownership of the property obtained thereunder and
> invests the seller with the ownership as if the contract had
> not been made. Continued exercise by the buyer of
> ownership or dominion of the property after notice of
> rescission and offer to return necessarily asserts
> ownership in the buyer, denies the ownership of the seller,
> and waives or withdraws the notice. (Citing authorities).

Binkholder v. Carpenter, 152 N.W.2d 592, 597 (Iowa 1967) (quoting Butler Mfg.

Co. v. Elliott & Cox, 233 N.W. 669)).

Thus, there are two relevant parts to any rescission.   The party seeking to

rescind must provide notice of the "election to rescind" and the party rescinding

"must restore or offer to restore, the status quo."   Id.   Here, it is undisputed Debtors

gave the notice of election to rescind.   It is also undisputed, however, that Debtor

did not restore or offer of restore the status quo.   The Court found that to be

dispositive in its ruling and finds it to be dispositive again.

Iowa law is clear: "Until restoration or offer to make restoration is made, there

is ordinarily, at law no rescission." Id.   See also Maytag Company v. Alward, 112

N.W.2d 654, 659 (Iowa 1962) ("If defendant proposes to repudiate its contract, it

can do no less than to restore to plaintiff that which it has received from him in

coordination of the agreement which it refuses to perform."); Kilpatrick v. Smith 19

N.W.2d 694, 705 (Iowa 1945) ("It is a well recognized rule that one who rescinds a

35

contract must restore or offer to restore the status of the other party.    He must

refrain or offer to return what he has received").

Debtor's failure to restore or offer to restore the status quo alone is fatal to its

claim the contract was properly rescinded or cancelled.    Debtor appears to claim –

without citing any supporting authority from Iowa – that restoration or offer of

restoration is no longer required after the merger of law and equity.    Debtor also

suggests the rule is not applicable when – like here – the party rescinding was

actually owed more by the non-rescinding party than the rescinding party owed.

Even assuming that was true (which it is not), the Court will address Debtor's

other assertions.    Debtor's main argument is that the Court committed an error of

law by not addressing the requirement that the restoration to status quo be a mutual

restoration.    Debtor argues that the Court failed to consider restoration to Debtor

and focuses only on restoration to Main Street.

The Court agrees that Iowa law requires mutual restoration of the status quo.

"Parties are returned to the status quo when benefits received under the contract have

been returned and liabilities incurred have been removed.    Thus, the plaintiff and

defendant must return to the other what each party has received."    Hyler v. Garner,

548 N.W.2d 864, 874 (Iowa 1996).    "Now rescission has a well-defined meaning in

law, and includes the idea of restoration of both parties to their status quo and the

return by each to the other of the consideration given and received."   Reiger v. Turley, 131 N.W. 866, 869 (Iowa 1911).   Stated another way:   "There is authority that the amount recoverable…is the amount he paid less the amount he received."   Folkers, 431 N.W.2d at 183 (citing Kilpatrick v. Smith, 19 N.W.2d 689, 705 (Iowa 1945).

Debtor, however, misapplies this mutuality of restoration in two critical ways.   First, Debtor does not apply mutual restoration to the status quo before the contract was made.   Second, Debtor offers only assumptions about what each of the parties owed without offering evidence to support them.   In fact, the assumptions are demonstrably incorrect.   Each of those misapplications of the mutuality rule will be discussed in turn.

The relevant status quo is the time immediately before the amended lease was executed.   "Each is to be restored to his former rights and placed in the situation each occupied before the contract was entered into, so far as is equitable and reasonably possible."   Folkers, 431 N.W.2d at 183 (citing Kilpatrick, 19 N.W.2d at 705) (emphasis added).   "Rescission is a restitutionary remedy which attempts to restore the parties to their positions at the time the contract was executed."   Potter, 426 N.W.2d at 151 (cited by Hoeppner v. Holladay, 741 N.W.2d 823 (Iowa Ct. App. 2007) (emphasis added).   The [non-rescinding party] is entitled to be put in the

position he occupied *before* the transaction complained of.   Sjulin v. Clifton

Furniture Co., 41 N.W.2d 721, 727 (Iowa 1950) (italics in original).

One of Debtor's assertion in the Motion to Reconsider is that its offset against

the $200,000 should be for the "back rent" owing at the time it entered the amended

lease.   The problem with Debtor's argument is that, at the time immediately before

the amended lease, Debtor held an alleged debt of $3.2 million in back rent and Main

Street held the $200,000.   That was the status quo to which things should have been

mutually restored.   Debtor cannot offset an amount owing before the amended lease

against an amount that was paid as consideration in the amended lease.

Debtor's alternative calculation for its offset is based on the value in rent

Main Street allegedly saved under the lease – the difference between the $900,000

annualized figure Main Street paid under the amended lease and the full rent Debtor

believed it was entitled to under the original lease.   Debtor specifically quantifies

this difference – based on the time the amended lease started until Debtor attempted

to cancel in March 2011 – to be $395,284.21.

There are again several problems with this alleged "rent savings" offset.

First, it is not supported by evidence.   The $395,284.21 is simply a calculation

Debtor performed as part of its Motion to Reconsider.   Debtor never offered this

number, any evidence to support it, or any of this argument at all during the hearing

38

on the issue.   A motion to reconsider "is not intended to allow parties to introduce

new evidence that was subject to discovery prior to trial, tender new theories, or

raise arguments which could have been offered or raised prior to judgment."

Crystalin,  293 B.R. at 465 ( citing Innovative Home Health Care, Inc. v. P.T.–O.T.

Assocs. of the Black Hills, 141 F.3d 1284, 1286 (8th Cir.1998)).

Second, even if the Court were to consider this assertion as having evidentiary

value, the calculation is demonstrably wrong on its face.   It assumes as a

foundational matter that Main Street was paying full rent under the original lease at

the time the amended lease was executed.   It is undisputed here, however, that Main

Street was making only sporadic, partial payments — paying as it could — based on

an agreement with Debtor.   Debtor, at most, would be entitled to offset the average

monthly rent it was receiving from Main Street immediately before the amended

lease.   While that amount was never specifically identified in the record, it is

certainly something less than the rent Debtor received under the amended lease.

Steve Semingson specifically admitted in the February 2012 hearing on the Motion

to Dismiss that the $900,000 amount he has been receiving under the amended lease

is significantly or substantially more than he and Debtor were receiving under the

original lase before the mediation agreement and amended lease.   The actual

amount collected before the act of rescission is in fact the proper calculation here –

where the non-rescinding party [Main Street] is entirely innocent:

> *Rental value*.   Restitution in favor of the defrauded plaintiff will include not only the assets he transferred, or their value, but also the value of their use.   As in many other instances, use value can be measured in a variety of ways.   With tangible property use value is **typically measured by market rental value; or by rents actually collected by the defendant while he held the property**. Although courts may speak of rental value in one case and rents collected in another, it is not certain that they are always distinguishing the terms.   Presumably, the **plaintiff** would always be entitled to the greater sum when the defendant is guilty of intentional fraud, but **would be entitled only to the actual use-value to the defendant if the defendant is innocent**.

*Dobbs Law of Remedies*, section 9.3(4) (Second ed. 1993) (emphasis added).

Moreover, either of Debtor's suggested offset numbers — the $3.2 million

"back rent" or the $395,000 for the rent savings — are also demonstrably wrong for

another important reason.   Both sums are based on an assumption Debtor was

entitled to full rent under the original lease.   The figures make no adjustment for the

value of Main Street's defenses against the demand for original lease back rent.

Those defenses go to the reduced value of the rental property because of significant

water problems and the lack of virtually any occupancy (let alone complementary

occupancy) in the building.   While the actual value of Main Street's defenses may

be disputed, the fact Main Street has defenses with some value does not appear to

40

ever have been disputed.   William Barstow testified at the Motion to Dismiss

hearing and the hearing on this matter that those claims had significant value.   No

one testified otherwise.   Debtor appears to have believed they had some value

because it required them to be released in the amended lease.   Debtor is itself

pursuing claims against the City and builders for the same water damage Main Street

has experienced.

At a minimum, the most recent Iowa Supreme Court case on rescission

requires the Court to reject Debtor's analysis for failure of proof.   Hyler, 548

N.W.2d at 874.   The Iowa Supreme Court stated:

> We agree that the proper restitution to be made to
> defendant should include a deduction for the [plaintiffs]
> use of the motor home.   The problem here is defendant
> identifies no evidence in the record which would permit
> the trial court to calculate a deduction . . . [Defendant]
> **failed to prove the amount of any offset to which it
> would be entitled**.

Id. (emphasis added).   Hyler makes it clear that the party asserting a deduction or

offset — like Debtor is here — must prove that assertion with evidence.   Debtor

entirely failed and fails to do so.

Debtor's suggest that Iowa rescission law — properly applied — supports a

rescission of the amended lease is wrong for yet another reason.   Debtor seeks to

place itself in a better position from rescission — $200,000 better — than it was

41

before the amended lease took effect.   Both parties must be placed in the same – not

better or worse – position they were in just before the transaction being rescinded.

Sjulin, 41 N.W.2d at 727.

"We have said the rescinding party is entitled to no profit from his bargain."   Id.

"We know of no reason why the other party should have any part of his gross profit."

Id.   "If plaintiff were compelled to pay defendant money in addition to the return of

[the property] he would not be left in the [same] position…occupied before the

transaction while defendant would occupy a better position."   Id.   Debtor proposes

a setoff that would leave Main Street in a worse position – down $200,000 in cash,

and Debtor in a better position -- $200,000 less owing on its obligation to the Bank.

Debtor's conduct after attempting to rescind also show the Debtor effectively

waived or withdrew the rescission.   As noted above:

> When the buyer rescinds, he renounces the contract and
> his ownership of the property obtained thereunder and
> invests the seller with the ownership as if the contract had
> not been made. **Continued exercise by the buyer of
> ownership or dominion of the property after notice of
> rescission and offer to return necessarily asserts
> ownership in the buyer, denies the ownership of the
> seller, and waives or withdraws the notice**. (Citing
> authorities).

Binkholder,152 N.W.2d at 597 (emphasis added).   Debtor waived or withdrew any

attempt to rescind by keeping the $200,000 "restructuring payment."   Moreover,

42

the Debtor continued to accept the $900,000 in annual rent without protest.   In fact,

Debtor featured arguments about having the $900,000 rental payment "pursuant to

the amended lease" repeatedly in its papers resisting the Motion to Dismiss.

Debtor also has acted as though the amended lease was not canceled at all.

Debtor blames the Bank – in the adversary counterclaim and in equitable

subordination arguments -- for withholding its consent and preventing Debtor from

being able to collect back rent under the original lease.   At the same time, as the

Bank has pointed out, Debtor never sued Main Street for back rent under the original

lease.   In sum, Debtor has also effectively waived or withdrawn any attempt to

cancel or rescind the lease.

Debtor's argument that the Court's decision on this matter should be

reconsidered is wrong for any of the numerous reasons stated above.

## 2.  <u>Newly Discovered Facts</u>

Debtor also argues that the facts that prompted the Court to decide the lease

issue early and on an expedited basis have turned out to be wrong.   Debtor asserts

Main Street's stated deadline for a financing decision on July 10, 2012 -- was not, in

fact, a real deadline at all.   Debtor points to new facts that purported to show Main

Street did not acquire the financing on or even shortly after July 10, 2012.   Debtor

points out Main Street instead discussed the possibility of moving out of the

property.   Debtor argues that these new facts require the Court to reassess the credibility of the parties and the testimony they provided.   Debtor also suggests that because there was no need to hurry a ruling, the Court should vacate its ruling made on an expedited basis and set the matter over for the confirmation hearing.

The Court disagrees.   When the Court decided the merits of the issues, it placed no reliance at all on the deadline Main Street told the Court it had to meet in July.   While the deadline hurried and significantly inconvenienced the Court, it did not affect the merits of the decision and provides no reason for reconsideration. Moreover, even accepting that this is relevant "new evidence", the Court would not change its findings of facts or analysis of the credibility of the parties.

### 3.   Reformation of Contract

Debtor also argues the Court erred in its original decision because it did not consider Debtor's alternative argument for "reformation" of the amended lease.   As noted, this issue was hardly raised by Debtor and certainly not a featured part of its argument or evidence.   Nevertheless, the Court will consider the argument here.

"It is well established that one who seeks reformation of a contract contending the instrument does not reflect the real agreement between the parties has the burden of establishing this contention by clear, satisfactory, and convincing proof." Folkers, 431 N.W.2d at 182 (citing Kufer v. Carson, 230 N.W.2d 500, 503 (Iowa

44

1975)).  "Facts and circumstances must be sufficiently compelling to constitute an

effectual appeal to the conscience of the court and prompt it to interfere by

reformation to mitigate the effects of the law." Id.

This Court, like the Iowa Court of Appeals in Folker (which also considered

rescission at length) concludes that Debtor has "not established by clear, satisfying,

and convincing proof the mutual mistake alleged." Id.   Here, Debtor sought to show

it did not get the agreement – on a global basis – that it thought it was getting.

Debtor did not, however, present or point to anything in the record to show that the

mistake – if there was one at all -- was mutual.   "There was no mutual mistake and

[the court] cannot through reformation change the terms of an agreement."   Id.

### 4.  **Equitable Fraud and Estoppel**

Debtor again argues that the Court could not decide — as it did —the issue of

the Bank's authority to withhold consent without also deciding the equitable fraud

and equitable estoppel arguments.   The Court again disagrees and finds that those

issues have been preserved in Debtor's counterclaim in the adversary case with the

Bank and at confirmation where it can make its equitable subordination arguments.

Moreover, Courts need not and should not take up equitable remedies where

there is a remedy at law.   See, e.g., In re Cushing, 230 B.R. 639, 641 (D. Conn.

1999) (citing Campaniello Imports, Ltd. V. Saporiti Italia S.P.A., 117 F.3d 655, 661

(2d Cir. 1997) ("Equitable remedies are, however, unavailable where there is an adequate remedy at law.").   "Equitable subordination was originally a judicially created remedy which was incorporated into the Bankruptcy Code in 1978."   In re Racing Services, Inc., 340 B.R. 73, 76 (8th Cir. 2006).   "Prior to its codification in 1978, bankruptcy courts relied on their inherent power as courts of equity to prevent a course of action which would reward fraudulent or otherwise inequitable conduct by subordinating certain claims to other ethically superior claims."   Id. at 78. "When Congress passed the current Bankruptcy Code in 1978, it expressly authorized equitable subordination."   Id. at 78.   Thus, despite its name, equitable subordination is now a legal doctrine.   Equitable fraud and equitable estoppel are purely equitable remedies.   In this case, Debtor has an adequate remedy at law — either by a money judgment in the adversary or subordination of the Bank's claims under the Bankruptcy Code at confirmation.   Because the Court finds Debtor has a sufficient remedy, it is unnecessary to consider the equitable fraud or equitable estoppel arguments.

## <u>CONCLUSION</u>

For all these reason stated, the Debtor's Motion to Reconsider is **DENIED**.

Dated and Entered:

January 3, 2013

_____
Thad J. Collins
Chief Bankruptcy Judge