## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Chapter 11** |
| CIVIC PARTNERS SIOUX CITY, | ) | |
| LLC, | ) | |
| Debtor. | ) | **Bankruptcy No. 11-00829** |
| | ) | |

## ORDER ON OBJECTIONS TO CONFIRMATION OF PLAN

This matter came before the Court at a hearing on Confirmation of Debtor's

Second Amended and Substituted Plan of Reorganization and creditors' objections

to it.  The Court held a confirmation hearing on January 14–18, 2013.  A. Frank

Baron and Malcolm Misuraca appeared on behalf of Civic Partners Sioux City,

LLC ("Civic").  Donald Molstad, Robert Marticello, and Autumn Spaeth appeared

on behalf of Steven Semingson, individually.  Jeff Wright and Lance Ehmcke

appeared on behalf of the City of Sioux City (the "City").  Bernard (Jerry) Spaeth

and G. Mark Rice appeared on behalf of First National Bank (the "Bank").

Richard Jefferies appeared for Main Street Theatres, Inc. ("Main Street") and

William Barstow, Main Street's owner.  After hearing the arguments of the parties,

the Court took the matter under advisement.  This is a core proceeding under

28 U.S.C. § 157(b)(2)(L).

## STATEMENT OF THE CASE

Debtor seeks to confirm its Plan over the objection of the Bank and the City—key creditors—through a process that has come to be known as "cram down."  The Plan seeks to significantly reduce the secured claim of its primary lender—the Bank—and to leave the City entirely unsecured.  The Plan also seeks to satisfy in full smaller debt that the Semingsons personally owe as guarantors.  The Semingsons, as the principals of Civic, also propose to retain an ownership interest (equity position) by a "new value" contribution.  Semingson proposes contributing $150,000 in new value.[1]

The Bank and City object to confirmation on several grounds.  They argue that the Plan fails to comply with key provisions of 11 U.S.C. § 1129(a).  Most notably, they argue the Plan is not feasible.  They argue that Civic bases Plan terms on an improperly low valuation of the building complex that serves as collateral.  They assert that, when properly valued, there is insufficient cash flow to make Plan payments.  In short, a higher valuation results in a larger secured claim for the Bank, which Civic must pay in full.  The Bank and City argue that Civic will not be able to do so on the Plan and projections before the Court.

The Bank and City also argue the Plan fails to comply with key requirements of § 1129(b), which prevents a "cram down" in this case.  They assert it fails the

---

[1] Post-hearing proposed modifications have purportedly altered the amount of new value.  However, the Court will not consider those modifications.

threshold requirement of paying the full value of secured claims. They also argue

Civic cannot satisfy the absolute priority rule and there is no "new value"

exception in the Eighth Circuit. Even if a new value exception exists, they further

assert that the "new value" Semingson offers is woefully insufficient. They ask the

Court to deny confirmation and dismiss this case.

Civic resists all arguments against confirmation. Civic also asks that the

Court deny the request for dismissal if it denies confirmation. For the reasons

stated below, the Court denies confirmation.

## FINDINGS OF FACT

The Court previously provided substantial relevant factual background in

other written opinions on matters related to this confirmation issue. Those facts

are incorporated by reference.

In 2000 and 2001, the City began efforts to revitalize its Historic Fourth

Street District area. The City invited a few development groups, including Civic

Partners, Inc., a California business owned by Semingson, to interview and submit

proposals for a part of the project. Civic Partners, Inc., then formed Civic Partners

Sioux City, LLC—Debtor in this case and hereinafter referred to simply as

"Civic". Civic's proposal included a movie theater complex and a hotel complex

adjacent to or as a part of the Historic Fourth Street District. The proposed movie

complex included several retail spaces for complementary tenants—restaurants,

bars, or other services.  The City chose Civic's proposal.  Civic entered into an

agreement with the City.  The City offered Civic cheap land and significant tax

increment financing ("TIF") in order to complete the development.

As part of the financing and encouragement of lender participation, the City

also promised to guarantee Civic's payments to its primary lenders for up to

$300,000 per year.[2]  For its part of the arrangement, Civic agreed to tax

assessments on a set, above-market property valuation for a set term.

Civic ended up building only the theater complex, known now as the

Promenade property.  Civic never developed the hotel complex on the other parcel

of property.  The City and Civic reached a settlement on Civic's failure to even

begin the hotel development.  Civic gave the City a $25,000 promissory note to

compensate for Civic's failure to perform.  Another developer put the property

slated for the hotel to a different use.  The movie theater and retail property (the

"Promenade property") is Civic's only major asset.  The future of the Promenade

property is at the center of this bankruptcy.

Civic signed the original development agreement and promissory note with

the City in 2001.  Civic received its primary construction financing from the Bank.

Civic and the Bank signed the construction financing agreement on February 21,

2003.  The Bank took a first mortgage and assignment of rents on the property in

---

[2] This guarantee is the subject of separate proceedings in Iowa state court. (Civic
Partners Sioux City, LLC, Ex. 49).

the amount of its loan—a principal sum of $5,625,000.  Civic's loan transaction

with the Bank specifically incorporated the City's guarantee of up to $300,000 per

year in payments.

On the same day, Civic signed an additional loan agreement with the City

borrowing $1,980,000.  They agreed, and the Bank loan documents made clear,

that the debt and mortgage between Civic and the City would be subordinate to

Civic's obligations to the Bank.  Thus, the City claimed a second mortgage on the

Promenade property.

In April 2003, Civic signed an agreement with ALY Construction, Inc. as

general contractor to build out the Promenade property.  The Promenade property

was designed and built to have an anchor tenant—a multi-screen movie theater—

and additional retail space to lease to shops and/or restaurants.  The development

plan called for the theater and other spaces to complement and support each other.

In 2004, Civic reached a lease agreement with its current anchor tenant,

Main Street.  Main Street is a regional movie theater operator.  That lease

agreement provided that Main Street would pay several categories of payments

totaling $1,200,000 in annual rent.  It is undisputed that Civic promised Main

Street that Civic would get complementary tenants into the vacant retail spaces as

soon as possible.

The rental agreement between Civic and Main Street contained additional terms that resulted in Civic obtaining additional lending for the project. Civic agreed to finance the installation of some furniture, fixtures, and equipment. This loan has been referred in short hand throughout these proceedings as the FF&E ("Furniture, Fixtures, and Equipment") Loan. Civic borrowed part of the money for the improvements from Liberty State Bank, which filed an Article 9 security interest in the property. It borrowed the remainder from the Small Business Association ("SBA"). The Semingsons individually guaranteed these two loan payments.

Main Street's annual rental payment included the monthly payments on Civic's FF&E loan. The payment also included the common area maintenance ("CAM") for the whole project—not just Main Street's space. In fact, the evidence revealed that, unbeknownst to Main Street, its annual rental payment under the Original Lease covered virtually all of Civic's debt service payments to the Bank and the City. In other words, Main Street's rent was essentially financing the whole project.

Main Street opened the theater portion of the project in November 2004. Construction continued on the remainder of the Promenade property after Main Street opened. This continuing construction affected Main Street's ability to attract movie-goers. Shortly after Main Street started operating the theater, the

6

Promenade facility began to experience significant water issues.  This too

significantly affected Main Street's ability to attract movie business.  These

problems made Main Street unable to make even one full annual rent payment.

Main Street repeatedly complained to Civic that Civic failed to provide a

sound, water-tight building, sufficient maintenance, and the complementary tenants

for the retail space.  To date, Civic has only leased one small part of the retail

space.  It is rented to a small dress shop, 6 South Designs.  This is not the type of

complementary tenant Civic described or Main Street envisioned.

The vacant retail space has never been occupied or even finished to a

rentable condition, with mostly bare studs (no drywall), dirt floors (referred to as

"granular fill"), and no ceiling.  There is limited electrical service to some spaces.

The vacant spaces will require significant expenditures to finish to a "vanilla shell"

or "vanilla box" condition—a standard, ready to rent, condition.  These spaces also

suffer from many of the same significant water drainage issues about which Main

Street has complained.   During a large rain or when the snow melts, water pools

on the sidewalk in front of the theater, inside the theater, and inside some of the

vacant retail space.

These water problems allegedly result from improper design or construction

of the building.  One such problem results in improper drainage (towards instead of

away from the building) resulting in water incursions during snow melt or heavy

7

rain.  Another problem comes from defects in the walls or wall and roof junction of the building itself, or both.  Some of these problems are serious enough that they could make the building structurally unsound if not fixed immediately.  These wall or roof junction defects also have allowed water incursions.  Those incursions have aggravated the water problems inside the theater in addition to eroding the structural soundness of the facility.

Civic's relationship with Main Street, over time, has gone from complicated to extremely adversarial.  Main Street's revenues fell far short of the parties' expectations for many of the reasons identified above.  Civic originally responded to Main Street's complaints and its inability to pay by telling Main Street to pay what it could.  As time went on, however, Main Street fell further and further behind on the original rent requirement.  Civic became frustrated with the lack of payments.  Main Street became equally frustrated that Civic had not corrected the problems at the site, and the complementary tenants Civic promised never materialized.

The relationship became increasingly adversarial when Civic began to demand full rental payments and $3,200,000 in back rent under the Original Lease. Civic asserted that these rental underpayments, combined with Civic's inability to develop the remaining retail space, caused Civic to fall behind on its own payments to the Bank, the City, and other lenders.  It became clear to all the parties

that the project was stuck and in deep trouble.  In an attempt to move forward, Civic, Main Street, the City, the Bank, Liberty National Bank, and others attempted mediation in mid-2009.  They hoped to restructure the parties' intertwined financial arrangements in a way that worked for everyone.  While normally not relevant to Court proceedings, the factual record surrounding and resulting from the mediation became uniquely relevant here.

The parties first gathered for a mediation session in Sioux City, Iowa.  The session did not result in an agreement.  However, most of the parties agreed to try another session.  After consultation, all parties—except the City—agreed to meet in Omaha, Nebraska for a second session.  The City had a conflict that prevented its attendance.  The City voiced its concerns about not being included.

The Omaha session went forward without the City.  At the conclusion of the Omaha session, the parties in attendance believed they had reached a tentative "global" agreement.  The agreement called for an Amended Lease between Civic and Main Street.  The Amended Lease dropped Main Street's annual rent to $900,000, but Main Street had to provide an immediate $200,000 payment to make the new lease effective.  The global agreement also called for modifications of Civic's obligations to the Bank and the City.  The parties hoped, or assumed, the City would adopt and sign their global agreement.  All of them knew, however, that the City Council needed to ratify the agreement before it could be effective.

9

While the City considered whether to ratify, the Bank, Civic, and Main Street all executed their respective agreements with each other in anticipation of the City's ratification.  In particular, Main Street and Civic entered into the Amended Lease dated November 2009, but effective September 2009.  The City reached a separate agreement with Liberty National Bank in which the City, as guarantor on the loan, purchased Liberty's claim.  The City, however, did not ultimately ratify or approve the global settlement agreement.

The City provided detailed testimony at the confirmation hearing about why it could not approve the global settlement agreement.  Robert Padmore, the Assistant City Manager who oversees finance, testified at length about the operation of the original financing agreement.  He noted that the TIF tied the City's project contributions to Civic's agreement to pay taxes at an above-market property assessment value.  The higher assessment value allowed the City to collect more property tax revenue, which essentially allowed Civic to pay the City's financing back over time.  Padmore also noted that the City's financing agreement with Civic contained City guarantees to help attract private financing for the project.  He then described how these two items—the agreed tax assessment and the loan guarantees—affected the City's ability to negotiate a new or modified deal.

10

Padmore explained that the City's consideration of the proposed settlement sought first and foremost to protect City taxpayers.  He noted that the proposed global mediation agreement did not help the City or protect taxpayers.  The global proposal dropped the tax assessment value of the property from $9 million to $6 million—which would seriously reduce the amount of tax revenue the City could receive.  The proposed agreement dropped the facial amount of the City's annual loan guarantee for each lender from $300,000 to $270,000, but that "new" guarantee potentially created even greater liability for the City because it was a "rolling" guarantee.  The proposed agreement allowed the unused portion of the guarantee for one year to be "rolled forward" to the next.  As such, the rolling guarantee could accumulate over the years—easily exceeding the original $300,000 fixed amount in later years.  He noted net exposure to the City drove its decision.  He did not recommend, nor did anyone on the council appear to support, the global agreement.  From the City's perspective, that agreement simply provided less revenue for the City and increased its exposure.

Padmore also described the City's disappointment with Civic's performance over the decade-long history of the project.  Civic breached virtually every agreement it had with the City.  Padmore resisted questions attempting to have him characterize Civic as a "pariah" or "toxic" to the City.  However, he admitted the City did not have a favorable view of Civic based on its dealings with Civic over

11

those many years.  He noted that Civic's financial contributions were only to

protect Civic's own interests.  Civic never sought to protect the taxpayers nor

ensure that it met other promises it made.  Sometime in 2009, Semingson made the

comment in Padmore's presence that Semingson was "done putting money in the

project."  Padmore noted the City has not received any payment from Civic since

that time.  He also noted the City's disappointment that the vacant retail spaces

were never rented.  The City expected other renters early in the project.  In the

City's view, Civic could have done much more, such as adjust the price, to make

that happen.

The City's failure to ratify the mediation agreement left serious uncertainty

about the effect of the other agreements already made between the parties

implementing the global agreement.  The Bank already executed documents

implementing a loan modification for Civic.  Civic and Main Street already

executed and operated under the Amended Lease.  Main Street made the $200,000

up front payment to Civic.  After it became clear the City would not ratify the

mediation agreement, the Bank cancelled its new agreements with Civic.  The

Bank then filed for foreclosure.

Civic did not, however, immediately attempt to cancel the Amended Lease

with Main Street.  Instead, Civic continued to collect the $900,000 annual rent

from Main Street.  Civic has admitted several times during the case that the

12

$900,000 annual rent under the Amended Lease far exceeded anything it had received from Main Street under the Original Lease.  Just before filing bankruptcy, however, Civic attempted to cancel or rescind the Amended Lease and reinstate the Original Lease.  Civic never offered or attempted to pay Main Street back for the $200,000 up front payment.  Civic similarly never offered to pay back any of the $900,000 rent, fix any of the problems with the property, or provide any new tenants in the vacant space.  Civic has, however, continually asserted throughout the entirety of this case that it is being treated very unfairly if it is held to the Amended Lease.

The Bank's agreement prevented Civic from terminating the Amended Lease without the Bank's consent, which affected Civic's attempt to cancel the Amended Lease on the eve of the bankruptcy filing.  The Bank never provided Civic with such consent.  Nevertheless, on March 30, 2011, Civic sent Main Street a notice purporting to terminate the Amended Lease and reinstate the Original Lease.  Civic then filed bankruptcy twelve days later and claimed the Amended Lease had been terminated and the Original Lease governed.  The other parties disagree.

Earlier in this bankruptcy case, the parties identified the "lease issue" as a critical threshold question in this case.  The particular question was which lease governed the case—the Original Lease that Civic believed it reinstated before

13

bankruptcy or the Amended Lease that all of the other parties supported. The

Court thus, as the parties' requested, took the lease issue out of order and held a

separate evidentiary hearing months before the confirmation hearing. The hearing

focused solely on the question of which lease was effective. This Court found that

the Amended Lease was in place and governed the case. (Transcript of Oral

Ruling on Lease, July 9, 2012, ECF Doc. No. 266.) Civic asked the Court to

reconsider its ruling, and the Court again found that the Amended Lease governed.

In re Civic Partners Sioux City, LLC, Bankr. No. 11-00829, 2013 WL 348066

(Bankr. N.D. Iowa Jan. 29, 2013). The facts and arguments surrounding that issue

are covered in great detail in that ruling. They will only briefly be covered here for

context.

Civic's Original Lease required Main Street to pay $1,200,000 in annual

rent. As noted, that lease paid Civic's entire debt service to the lenders, and Main

Street's rent was financing the whole project. Main Street apparently was unaware

it was financing the whole project. Nevertheless, Main Street has repeatedly

pointed out that it signed the Original Lease based on representations from Civic

about the building quality and future occupancy that never materialized. Main

Street has argued throughout that it did not get the benefit of the original bargain.

Main Street argued and presented credible testimony that the Amended

Lease intended to adjust annual rent down to $900,000 to compromise outstanding

14

issues.  These outstanding issues included Main Street's complaints about the poor

condition and water damage at the property and Civic's failure to deliver

complementary tenants to the building.  Main Street also proved Civic never

offered to pay back the $200,000 up front payment or otherwise attempted to

reinstate the status quo as it existed before the Amended Lease was signed.  The

other evidence in this case strongly supports the argument and evidence offered by

Main Street.

Throughout the case, the Court has heard testimony and argument on the

defects in the property that Main Street complained about to Civic.  These defects

are largely undisputed.  They have been detailed in the testimony of Kevin

Godwin.  Civic originally hired Godwin in 2008 to provide a description of the

defects and to prepare a report on what needed to be fixed.  He testified, and his

report became part of the record, in the hearing on the Motion to Dismiss.  Godwin

also testified in more detail at the confirmation hearing.  He did so after he updated

his report and findings based on additional site visits.  Godwin's testimony is some

of the most credible, objective, and thoughtful this Court has ever heard.

Godwin testified about the significant water problems and structural

problems facing the Promenade building.  Godwin noted the building was slightly

lower and downhill from the street.  He noted the street had no curb.  He pointed

out that water from the street and surrounding area ran into and infiltrated the

15

building at various places.  He noted the effects on Main Street's space, and the vacant retail spaces.  He noted that Civic did not fix these problems.

Godwin also testified about several other problems surrounding the design or construction of the building.  Godwin pointed out more water infiltration problems resulting from poor or inadequate design, construction, and maintenance. He testified that the roof assembly, flashing, and concrete masonry outer walls were spots of serious concern.  He noted most of the problems were not fixed in the 8–9 years the building had been open and remained a major concern.  When asked when those problems needed to be fixed, he said "yesterday."  He indicated they would only get worse and cause more problems over time.  When asked whether the problems could have been fixed before this time, he said yes and noted he identified them back in 2008.  For example, he stated the sealing work needed for the concrete masonry could have been done at many points, including during the summer of 2012—one of the driest summers ever on record.

The evidence is also largely undisputed that the maintenance and repair issues affected the vacant rental spaces as well as Main Street's space.  Civic engaged in little or no activity demonstrating attempts to rent those vacant spaces for the duration of the project.  Civic's ownership did little more than simply list the spaces for rent with a realtor.  There were a few showings and little interest overall.  Civic never agreed to adjust the price downward to meet the market at the

time.  Unrefuted testimony showed that Main Street—not Civic—attempted to clean up the vacant spaces so the spaces would show better and make the overall project more appealing.  One witness noted that the spaces got so little attention from Civic that, at one point, a tree was growing inside one of the vacant spaces in the dirt on the floor.  Main Street eventually cut the tree down, rented power washers, and cleaned up the vacant spaces.

The Court finds that the condition of the vacant retail spaces, the water problems, and lack of realistic marketing were the reasons the retail spaces were not filled.  The Court finds that Civic's ownership put little overall effort into the necessities required to rent the spaces.  It never put the money in to get those spaces even to a vanilla shell—ready to rent—condition.  As the testimony revealed, Semingson, Civic's main owner, decided not to put any more money into the project in 2009.

Civic made assertions that it had a maintenance person on-site or available to be on site throughout the project.  Civic also testified that it had made an attempt to make several of the building repairs.  The Court finds both of these assertions to be largely untrue.

Godwin specifically noted that only a small amount of repair work was completed and that most of the repairs or improvements could have or should have been done long ago.  William Barstow, the owner of Main Street, testified the same

17

way.  He also testified he had **never** seen a maintenance person.  He also testified

that he got tired of waiting for many of the critical repairs to be completed and did

them himself.  The record demonstrates that Civic was largely an absentee owner

and landlord.

The other redevelopments of the Historic Fourth Street area has gone very

well.  The community considers it a destination for dining, shopping, and

entertainment.  Main Street's theater is widely recognized as an excellent and

attractive place to see movies.  The testimony showed that it had 60%–70% of the

Sioux City area movie business.  Thus, factors other than those noted above, that

could have contributed to vacant space in the Promenade property were simply not

present.  Padmore specifically noted that he did not believe the general economic

downturn following the 2008 crisis was a real factor in this equation.  He noted the

remainder of Historic Fourth Street—and particularly Main Street—grew during

and after those times.

Since Main Street began operating in the partially completed complex in

November 2004, Civic displayed little effort to move the project forward.  The

attempt to rework the various agreements through mediation largely focused on

each party protecting its interests.  Civic did not bring new energy, value, or ideas

to the project then or at any other time.

18

As noted, after the mediation failed, the Bank brought a money judgment

and foreclosure action against Civic.  The City brought a breach of contract action

against Civic for failure to pay on the City's additional loan.  Civic counterclaimed

in both cases.  In the suit with the Bank, Civic asserted that the City and the Bank

together or separately tortiously interfered with Civic's business and relationship

with Main Street.  In the suit with the City, Civic counterclaimed for the design

and construction defects related to the grade between the street and façade of the

Promenade property complex.  Soon after Civic filed for bankruptcy, it removed

these two state court lawsuits, and another state court suit it earlier filed against

ALY Construction for construction defects, to this Court.

## PROCEDURAL BACKGROUND AND ARGUMENTS OF THE PARTIES

Civic filed a voluntary Chapter 11 petition on April 11, 2011.  Seventeen

months later, on September 26, 2012, Civic filed this Second Amended and

Substituted Plan of Reorganization ("the Plan").  The Plan failed to gain the

acceptance of all creditors.  Civic has elected, however, to go forward with the

Plan and seeks confirmation of that plan over creditor objections.  The Plan and

creditor objections developed out of—or in reaction to—various events in the long

history of this case.

### A.    First Plan of Reorganization

Civic filed the first plan only in response to the Bank's First Motion to

Dismiss for Civic's failure to file a plan.  Civic's first plan essentially provided for

reinstatement of the Original Lease, Civic's assertion of $3,200,000 in back rent

against Main Street, and equitable subordination of the Bank's and the City's

claims.  The main theme of this plan was that the Bank and the City improperly

conspired to strike a deal with Main Street to purchase the property out from under

Civic, leaving it with nothing.

### B.    Motion to Dismiss First Plan

The Bank made a second Motion to Dismiss after Civic filed the first plan.

The Bank argued that it was impossible to confirm the first plan on its face.  The

Bank claimed the first plan used two entirely baseless assumptions.  The first was

that Main Street could afford to pay back rent or was even responsible for back

rent.  The second was that there was any conduct by the Bank, the City, or any

other creditor that could possibly justify equitable subordination.

The Court held an evidentiary hearing on the Motion to Dismiss in Sioux

City, Iowa.  Before the hearing, the parties agreed to a site visit by the Court.  The

parties and Mr. Godwin accompanied the Court; each took turns pointing out the

various items that were at issue in this case.  At the hearing, Robert Marticello

appeared for the first time on behalf of Semingson individually.  He has, however,

20

been representing Civic as much as Semingson during much of the proceedings.

The Court has allowed him to do so over the strong objection of the creditors.

Barstow, Goodwin, and Semingson all testified at the hearing. They

discussed the state of the project, repairs needed, viability of Civic's operation,

back rent, and the Bank's conduct, among other things. While it was clear that the

parties had strong differences about the facts related to the first plan, the testimony

and arguments took a different turn as the hearing developed. Marticello presented

testimony from Semingson about Civic's intent to file an Amended Plan,

Semingson's intent to consider a new value contribution, and the amount of liquid

assets Semingson had and would consider using for that contribution. Semingson

testified that he and his entities had up to $1,200,000 of liquidity that could be

contributed for the right agreement. The Court denied the Motion to Dismiss

largely based on the new direction of the case.

### C.    Amended Plan and Second Amended Plan

Civic eventually filed the Amended Plan discussed at the Motion to Dismiss

hearing. The Bank, the City, and Main Street expressed great disappointment with

the contents. While the Amended Plan did contain a "new value" contribution of

$150,000, these creditors agreed that this amount was woefully inadequate. They

pointed out the contribution would not cover any of the needed repairs, the

necessary minimal finishes of the vacant space, marketing, or other related items

21

necessary to move the project ahead.  Instead, they argued the contribution would basically pay only professional fees.  The creditor group also noted that they were particularly disturbed that the Amended Plan still provided for reinstatement of the Original Lease, recovery of back rent from Main Street, and pursuit of equitable subordination theories to accomplish Civic's reorganization.

During a status conference on the case, counsel for Semingson suggested that a decision on which lease would govern the case might help the parties move forward—and possibly to a place where a settlement conference could be helpful. Main Street largely agreed.  Main Street noted that it needed to know where it stood before July 10, 2012.  That date was important for it to decide on financing for its proposed conversion from film to digital projection.  The Court agreed to expedite this process.  The Court held a hearing in Sioux City on June 21, 2012. Barstow and Semingson testified.  The Court allowed post-hearing briefing and provided an oral ruling to the parties on July 9, 2012.  The Court concluded that the Amended Lease controlled.

Civic filed a Motion to Reconsider the ruling.  Main Street put the brakes on financing.  The Court heard extensive argument again on the Motion to Reconsider.  While this decision was pending, the Court ordered the parties to a settlement conference.  It was ultimately unsuccessful.

22

Civic filed a Second Amended Plan—the one presently before the Court.  It

was—in concept—largely similar to the Amended Plan.  The Bank, the City, and

Main Street objected.  Main Street backed off of most of its objections after the

Court denied the Motion to Reconsider and reiterated that the Amended Lease

governed this case.

### D.       The Bank's Objections to Confirmation of Second Amended Plan

On October 10, 2012, the Bank filed its objection to the Plan.  The Bank is

by far the largest secured creditor and the creditor with the largest overall claim.

The Bank objects under § 1129(a) and (b).  The Bank's main argument under

§ 1129(a) is that the Plan is not feasible.  The Bank essentially argues its secured

claim has a much greater value than Civic gives it in the Plan.  The Bank believes

that when its secured claim—which must be paid in full—is properly valued, Civic

will not be able to make the payments required.  Because Civic will be unable to

make the required payments, the Bank argues the plan is not feasible on its face.

The Bank has two forms of collateral that secure its $6,200,000 claim.  The

Bank has a first mortgage on the Promenade property.  It also has a secured interest

in the rents and proceeds of Civic's operation.  The Bank claims the Promenade

property is worth more than Civic assumes in the Plan and thus, more of the

Bank's claim is secured by the property.  The Bank also claims that the Plan fails

to properly recognize and account for the Bank's continually accumulating security

23

interests in the post-petition rents, cash, and other general intangibles.  While Civic

recognizes the Bank has security interests in post-petition rents under § 552(b), the

Bank disagrees with Civic's proposed method to recognize and account for these

interests.  Civic and the Bank also appear to have agreed to special post-petition

payments for single-asset real estate cases under § 362(d)(3).  The record is unclear

whether the § 362(d)(3) payments made were in addition to the § 552(b) payments,

or treated as one lump sum.

These post-petition payments represent a significant sum of money.  As of

March 2013, the Bank received $564,145.34 in post-petition payments.  Civic

continues to pay approximately $30,000 a month.  Civic used post-petition rents

from Main Street to make the § 552(b) or § 362(d)(3) payments.  Again, they agree

on the amount paid to date and that there is a statutory basis for the payments.

They disagree, however, about how the payment should be applied to the Bank's

claim.

Civic argues the post-petition payments have reduced the Bank's secured

claim, leaving a larger unsecured portion.  In making that argument, Civic relies on

language from United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.,

Ltd., 484 U.S. 365, 374 (1988).  Civic believes Timbers held that a secured claim

in bankruptcy is fixed in value at the start of the case.  Civic believes the post-

petition payments it made must be used to reduce the Bank's secured claim.  If not,

24

Civic argues that the secured claim would be allowed to grow—not remain fixed—during bankruptcy, contrary to Timbers.

The Bank argues Civic misreads Timbers.  The Bank argues Timbers allows the Bank to apply—not prevents it from applying—the post-petition payments against the Bank's unsecured claim, leaving a larger amount of its claim secured. In sum, the Bank believes that Civic has improperly valued the Promenade property and improperly applied the post-petition payments.  The Bank believes this combination of errors has led Civic to believe, improperly, that Civic has reduced the Bank's secured claim.  The Bank believes that when the property has a proper valuation and the post-petition payments are correctly applied to only the Bank's unsecured claims, the Bank's secured claim is significantly larger than Civic provides for under the Plan.  The Bank concludes that Civic cannot pay that larger claim and the Plan is not feasible.

The Bank also argues the Plan is not feasible under § 1129(a)(11) for additional reasons.  The Bank argues Civic's cash flow projections are not credible.  The Bank notes Semingson has previously admitted that the Promenade operation does not produce sufficient revenue to cover its expenses.  The Bank argues the minimal new value proposed ($150,000) is insufficient to change the inadequate cash flow.  The Bank further points out the required repairs and basic property improvements needed to make the vacant spaces "rentable" would

25

probably exceed $1,000,000.  However, no such money is available to Civic now or in the realistic future.  The Bank believes the Plan and related projections are simply not plausible and are nothing more than unfounded speculation.

The Bank also claims that even if Civic could satisfy the § 1129(a)(11) feasibility requirement and other § 1129(a) requirements, the Plan does not, and cannot, satisfy the § 1129(b) requirements for "cram down."  The Bank argues the Plan is not "fair and equitable" and does not allow the Bank to receive the present value of its secured claim as § 1129(b) requires.  The Bank argues—similar to its feasibility argument—that because Civic undervalues the Bank's secured claim, it fails to identify the correct secured value of, or funds to pay, the Bank's secured claim.

At a minimum, the Bank argues that even if the Court ignores all other defects, the Plan still fails to satisfy the "absolute priority rule" of § 1129(b)(2)(B). The Plan improperly allows the Semingsons, as equity holders, to retain their interest in Civic before all claims with a higher priority are paid in full, which violates the absolute priority rule.  The Bank acknowledges that the Plan attempts to get around the absolute priority rule by applying a new value exception to that rule.  The new value contribution of $150,000 comes from Semingson.  The Bank asserts the new value exception does not apply in the Eighth Circuit and is not authorized by any Code language.  The Bank finally argues that even if the new

26

value exception exists, Semingson does not provide sufficient new value to get the

benefit from this extra-statutory exception.

### E.    The City's Objections to Confirmation of Second Amended Plan

The City also filed its objections to confirmation of the Plan at the same

time as the Bank.  Like the Bank, the City claims the Plan is not feasible under

§ 1129(a)(11) and is not "fair and equitable" as required under § 1129(b).  The

City's arguments are largely the same as the Bank's arguments on those issues.

The City notes in particular that even if there is a new value exception, the new

value must be "necessary" and, as such, must be more than a "mere token."  Id.

The City argues that Semingson's proposed new value contribution is a mere token

and falls nowhere close to the amounts necessary for successful reorganization.

The City also objects to the limited § 362(d)(3) payments Civic has made to

the Bank post-petition.  The City argues that Civic has improperly accumulated

cash "by paying substantially less than is required to keep the automatic stay in

place beyond the deadline imposed by 11 U.S.C. § 362(d)(3)."  (City's Objections

to Confirmation, ECF Doc. No. 290, at 3.)   The City notes Civic never sought nor

received court approval of the monthly interest paid on the Bank's claim.  The City

believes those payments were made based on Civic's "unilateral" and "low-ball"

valuation of the Promenade property at $4.75 million.  The City argues that Civic

should have used its held cash to pay § 362(d)(3) interest to other creditors with
liens on the Promenade property or to the Bank to reduce its claim.

The City also objects that the Plan was not proposed in good faith as
required by § 1129(a)(3).  The City notes that "the only claims [Civic] proposes to
pay in full are claims that Mr. Semingson personally guaranteed."  (ECF Doc. No.
290, at 13).  Thus, the City argues that the Plan is more focused on paying or
delaying Semingon's personal creditors rather than reorganizing Civic.  The City
also objects that the Plan "unfairly discriminates in its classification of claims
under 11 U.S.C. § 1122," which is a violation of § 1129(a)(10).  The City argues
that Civic unfairly separates the City's class 4 claim and SBA's class 6 claim.  The
SBA holds claims Semingson personally guaranteed, which are paid in full.  The
SBA voted to accept the Plan.  The City notes that "claims cannot be separately
classified 'for the purpose of securing an accepting class' under § 1129(a)(10)."
(ECF Doc. No. 290, at 9).

### F.     Main Street's Objections to Confirmation of Second Amended Plan

Main Street also filed similar confirmation objections.  Main Street's
primary objections, however, related to whether the Original or Amended Lease
governed.  After the Court's decisions on the lease issues, Main Street decided to
be a limited participant in the confirmation hearing.  Main Street stated that if the
Amended Lease governed, it was prepared to perform.

28

### G.     Civic's Response

On October 24, 2012, Civic filed a 72-page brief in response to the

objections and in support of confirmation.  The brief detailed all of Civic's

positions and reiterated its intent to pursue equitable subordination of the Bank and

City's claims.  Civic also reiterated its intent to pursue reinstatement of the

Original Lease with Main Street and recover the $3,200,000 back rent owed.

While the Court already ruled that the Amended Lease—not the Original Lease—

applied, Civic's Motion to Reconsider was still pending at the time Civic filed their

brief.

### H.     The Court's Ruling on Amended Lease

Just before the confirmation hearing, the Court issued its Ruling on Civic's

Motion to Reconsider its Oral Ruling finding the Amended Lease governed this

case.  The Court effectively denied the Motion to Reconsider.  The Court made

extensive findings and conclusions on the matter.  Civic did not amend its Second

Amended Plan to reflect this ruling.  Instead, Civic appealed this order just as the

confirmation hearing began.

### I.     Confirmation Hearing

On January 14–18, 2013, the Court held a confirmation hearing in Sioux

City on Civic's Second Amended and Substituted Plan and the parties' objections.

At the end of the hearing, the Court ruled that Civic's equitable subordination

claims were entirely unproven and without merit.  The Court took other

confirmation matters under advisement and agreed to make the ruling on equitable

subordination a final order at the time it ruled on these other matters.

### J.    Post-Hearing Plan Modification

On January 25, 2013, a week after the confirmation hearing, Civic filed a

Motion for Further Non-Material Modifications to the Second Amended and

Substituted Plan (the "Modified Plan").  Civic proposed these "non-material"

modifications to try to resolve objections by the Bank and the City.  Civic also

purported to address the concerns the Court expressed several times during the

week-long confirmation hearing.  In particular, Civic purported to propose an

increased new value contribution.  Civic proposed that Semingson would still

contribute $150,000 at the time of confirmation, but also would add contributions

of $150,000 on the two-year and three-year anniversary of the Plan's effective

date.  Thus, Civic asserted that it would obtain an additional $300,000 in new

value, for a $450,000 total new value contribution from Semingson.

Civic also proposed that it retain a third-party property manager.

Additionally, Civic proposed a "new treatment" for any money it recovers on its

construction defects claims.  If the recovery exceeded the costs to litigate and

repair the building, then Civic would use those excess funds to pay the Bank's

allowed Class 1 Secured Claim.  Civic also proposed to increase distributions to

unsecured creditors in plan years 10–15 of the Modified Plan. That proposed

increase would go to non-insider unsecured creditors. They would receive "fifty

percent (50%) of the net operating income received by the Reorganized Debtor in

that Plan Year over $150,000 after operating expenses, debt service, tenant

improvement costs, leasing commissions, and repair costs and capital

improvements."

Upon confirmation, Civic also proposed to assume the Amended Lease with

Main Street. Civic had previously reserved all rights under the Original Lease.

Civic believes this shows its intent to give Main Street the assurance it needs to

operate.

Additionally, Civic proposed a new property valuation. Civic proposed that

the Court adopt a "mid-point" between the two appraisers' numbers. Civic

believes that mid-point to be $4,940,000. Civic also offered new projections

showing that if the Court used that $4,940,000 figure as the proper valuation, the

Plan would still be feasible.

### K.      Objections to Post-Confirmation Modification

The Bank and the City object to Civic's proposed plan modifications. They

both ask the Court to ignore the proposed modifications and evaluate the Plan

presented at the hearing. On the merits of the proposed modifications, the Bank

argues that Civic offers new value in the modification because Civic does not

provide the additional payments up front.  Instead, the Bank argues the payments are a mere personal promise by Semingson to pay in two and three years—if things are progressing with the Plan to his liking.  The Bank argues such a "contribution is not 'money or money's worth'" and therefore does not meet "a basic requirement" of new value.

The Bank argues the proposed property manager is not new.  It is the same manager/realtor that has allowed the maintenance problems to persist.  The Bank states that the proposed payment of any litigation recoveries to the Bank on its secured claim is meaningless.  The Bank points out it already has a security interest in those recoveries.  Moreover, according to the Bank, any recovery would simply add to the amount of the Bank's secured position and increase the amount needed to pay the Bank in full.

The Bank argues the proposed increased distribution to unsecured creditors also is meaningless because it is impossible to calculate or validate.  The new number—50% of operating income above $150,000 after subtracting unquantified costs—is "not a real number, but an imaginary scenario."  Finally, the Bank argues the "new" post-hearing plan and its new projections are still unworkable and not feasible.  The Bank continues to argue the modifications are based only on speculative statements.

On the merits, the City largely agrees with the Bank.  The City also

separately objects to Civic's new proposed mid-point valuation.   The City argues

there is no expert support for, or evidence of, a hypothetical mid-point valuation.

The City notes it is just an arbitrary point.

### L.    Civic's Reply

On February 11, 2013, Civic replied to the objections of the Bank and the

City.  Civic reiterated its belief that the proposed modifications are non-material

because they propose increased payments.  Civic asserts that the modification

demonstrates Civic's willingness to attempt to bridge the gap between the parties.

Civic also addressed all of the Bank's and the City's arguments in detail.

## CONCLUSIONS OF LAW AND DISCUSSION

### I.   General Confirmation Standards

In order to confirm a Chapter 11 reorganization plan, the plan must satisfy

all sixteen requirements of 11 U.S.C. § 1129(a).   In re Riverbend Leasing LLC,

458 B.R. 520, 525–26 (Bankr. S.D. Iowa 2011).  However, § 1129(b) permits

confirmation over the objection of a creditor in some circumstances despite failing

to obtain the consent of all creditor classes under § 1129(a)(8).  11 U.S.C.

§ 1129(a)–(b) (2012).  Section 1129(b)(1) provides for confirmation over creditor's

objections if "the plan does not discriminate unfairly, and is fair and equitable"

with regard to those creditors.  Id. § 1129(b)(1).  Such plans are "referred to as

cram down plans because they have been 'crammed down the throats of objecting creditors.'"  River Rd. Hotel Partners, LLC v. Amalgamated Bank, 651 F.3d 642, 647 (7th Cir. 2001) (quoting Kham & Nate's Shoes No. 2, Inc. v. First Bank, 908 F.2d 1351, 1359 (7th Cir. 1990)); see also In re Windsor on the River, 7 F.3d 127, 131 (8th Cir. 1993) (refers to such plans "being 'crammed down' the throat of second lenders").

"The proponent of the plan bears the burden of proof with respect to each element of §§ 1129(a) and 1129(b) under a preponderance of the evidence standard."  In re Internet Navigator Inc., 289 B.R. 128, 129 (Bankr. N.D. Iowa 2003) (citation omitted).  The Bank and the City argue that Civic failed to establish the necessary elements of both § 1129(a) and § 1129(b).

## II.  Confirmation Requirements Under 11 U.SC. § 1129(a)

While § 1129(b) allows for the Court to approve a Chapter 11 plan, even where Civic has failed to gain the acceptance of every class under § 1129(a)(8), Civic still must meet the other 15 requirements of § 1129(a).  The Bank and the City object that the Plan fails to satisfy §§ 1129(a)(3), (a)(7), (a)(10), and (a)(11).  Their main argument, however, is that the Plan is not feasible under § 1129(a)(11).

### A.  Feasibility Under 11 U.S.C. § 1129(a)(11)

In order to confirm a plan, the Court must find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial

34

reorganization, of Debtor or any successor to Debtor under the plan, unless such

liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

This has come to be known as the "feasibility requirement." In re Monnier Bros.,

755 F.2d 1336, 1340 (8th Cir. 1985). "[T]he bankruptcy court has an obligation to

scrutinize the plan carefully to determine whether it offers a reasonable prospect of

success and is workable." In re Gilbertson Rest. LLC, No. 04-00385, 2005 WL

783063, at *5 (Bankr. N.D. Iowa Apr. 4, 2005).

    This Court has more recently offered some additional detail on the standards

it will apply when considering plan feasibility:

> To determine the feasibility of a plan, the court must ascertain the
> probability of actual performance of the provisions of the plan. In re
> Mosbrucker, 227 B.R. 434, 437 (B.A.P. 8th Cir. 1998), aff'd, 198
> F.3d 250 (8th Cir. 1999). Feasibility of a Debtor's plan is a factual
> determination. Id.
>
> This feasibility standard requires the Court to determine whether the
> plan offers a reasonable prospect of success and is workable. In re
> Monnier Bros., 755 F.2d 1336, 1341 (8th Cir. 1985). The test is
> whether the things which are to be done after confirmation can be
> done as a practical matter under the facts. In re Clarkson, 767 F.2d
> 417, 420 (8th Cir. 1985).
>
> The Eighth Circuit's feasibility test considers whether provisions in a
> plan are achievable given the unique facts of the case. In re Bowman,
> 253 B.R. 233, 238–39 (B.A.P. 8th Cir. 2000). This Court will only
> approve a plan if it has a rational likelihood of success. In re Danny
> Thomas Prop. II Ltd. P'ship, 241 F.3d 959, 963 (8th Cir. 2001).

In re Puff, No. 10-01877, 2012 WL 994007, at *5–6 (Bankr. N.D. Iowa Mar. 23,

2012) (citing In re Richards, No. 03-02487, 2004 WL 764526, at *2–3 (Bankr.

N.D. Iowa Apr. 2, 2004)).  "This [feasibility] test is meant to **prevent** confirmation

of plans based on **speculation**."  <u>Riverbend Leasing</u>, 450 B.R. at 531–32

(emphasis added).

A number of courts have used a six-factor test to further guide the feasibility

determination:

> (1) the adequacy of the debtor's capital structure; (2) the earning
> power of the debtor's business; (3) economic conditions; (4) the ability
> of the debtor's management; (5) the probability of the continuation of
> the same management; and (6) and [sic] any other related matter
> which determines the prospects of a sufficiently successful operation
> to enable performance of the provisions of the plan.

<u>In re Save Our Springs (S.O.S.) Alliance, Inc.</u>, 632 F.3d 168, 173 (5th Cir. 2011)

(quoting <u>In re M & S Assocs., Ltd.</u>, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992)).

The Court will use this as a reference point for its analysis as well.

The Bank and the City make several arguments about feasibility.  Virtually

all of those arguments are directly related to or affected by their main argument—

that the Plan has significantly undervalued the Bank's secured claim.  There is no

dispute the law requires the Plan to pay the Bank's secured claim in full, over the

life of the plan.  <u>See</u> <u>In re Danny Thomas Prop.</u>, 241 F.3d at 963.  The Bank and

the City assert that when its secured claim is properly determined, Civic simply

cannot afford to make the payments required.  Thus, they argue the Plan is not

feasible.  The Bank and the City also argue the Plan is not feasible because it is

based on unreliable and unrealistic projections, and proposes to continue along the same path with the same management.

### 1.    Valuation of the Bank's Secured claim

The Bank has a first priority security interest in Civic's real property.  The Bank also has a security interest in rents, cash, and general intangibles.  The Bank believes this includes the claims Civic possessed for construction defects and drainage issues.  Civic does not deny that the Bank's security interest extends to the real property and rents.  Civic disputes the existence of the Bank's security interest only as extended to Civic's legal claims.  Civic does argue, however, that the value of the Bank's total secured claim is significantly less than the Bank asserts.

Section 506 governs "Determination of Secured Status."  11 U.S.C. § 506 (2012).  Under § 506, "a secured creditor's claim is to be divided into secured and unsecured portions, with the secured portion of the claim limited to the value of the collateral."  Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 961 (1997) (citing United States v. Ron Pain Enters., Inc., 489 U.S. 235, 238–39 (1989)); see also 11 U.S.C. § 506(a)(1) ("An allowed claim . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property.")  "To separate the secured from the unsecured portion of a claim, a court must **compare**

37

**the creditor's claim to the value of** 'such property,' i.e., **the collateral**." <u>Rash</u>, 520 U.S. at 961 (emphasis added).

The property's "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property."  11 U.S.C. § 506(a)(1).  Civic proposes to continue to use the property that serves as the Bank's collateral.  Thus, the correct measure for value is the "replacement-value." <u>See</u> <u>Rash</u>, 520 U.S. at 963 ("That actual use [represented by the replacement-value standard], rather than a foreclosure sale that will not take place is the proper guide under a prescription hinged to the property's 'disposition or use.'")  Stated another way, "under § 506(a), the value of the property retained [in a] 'cram down' option is the cost a debtor would incur to obtain a like asset for the same 'proposed . . . use.'"  <u>Id.</u> at 965.  The fact the Bank holds the first priority mortgage on the Promenade property, and that property is a large part of the total value in this case, makes its valuation critically important to determining the total value of the Bank's secured claim.

### a.    Valuation of the Promenade Property: Competing Appraisals

Civic disagrees with the Bank and the City about the value of the Promenade property.  The value of the property represents the vast majority of Civic's assets. The Bank has the first priority mortgage on the Promenade property.  The City has the second priority mortgage on the property.

Civic and the City have offered competing expert valuations. The Plan is based on the appraisal of Civic's expert, Fred Lock. The Bank and the City both object to Civic's proposed valuation. They ask the Court to adopt the appraisal of the City's expert, Steven Shaykett. The Bank and the City argue, at a minimum, the property value is much higher than the value proposed by Civic and its expert.

Civic's expert, Fred Lock, valued the property at $4,200,000 before making deductions for repairs. Lock asserted that no buyer would buy the property without allowing the cost of repairing the construction defects and drainage issues. After making these declarations, Lock arrived at a value of $3,910,000. This was based on an estimate for repairs of $290,000. At the confirmation hearing, Lock amended his opinion to further reduce the value based on newly-obtained estimates for the full amount of repairs totaling an additional $400,000. Lock concluded the property was worth $3,510,000.

The City's expert, Shaykett, valued the property at $5,540,000, roughly $2,000,000 more than Civic's appraisal. The Bank submitted a total claim of $6,262,107.63. While under either valuation the Bank is at least partially secured by the property and the City is unsecured,[3] the nearly $2,000,000 difference in

---

[3] However, while Civic admits that the City is not likely to be secured, Civic has scheduled the City as a secured creditor "only if and to the extent the value its collateral exceeded the amount of the Bank's secured claim." (ECF Doc. No. 281, p. 23.)

valuations dramatically affects how much of the Bank's claim is secured and thus the amount Civic must pay in full under the Plan.

The experts largely agreed on the appropriate method of valuation: discounting future cash flows. They disagreed about two variables to use in the computation: the length of time used to measure cash flow and the numbers to input for future cash flow. Civic's expert, Lock, uses a ten-year holding period with a projected sale after ten years. The City's expert, Shaykett, uses a seven-year holding period with a projected sale after seven years.

They both use the seven years of annual rent remaining under the Amended Lease in projecting future cash flow. Shaykett stops there. He believes a prospective buyer would be more interested in the cash flow for the known and definite seven-year period than adding three years of estimates. Shaykett thus believes this known amount and period provide the most accurate forecast of how a buyer would determine value. Shaykett did, however, provide an estimate of the year-eight rent, the first year of unknown rent. This projection of a year of future rent helps to provide the proper reversion value for Shaykett's calculation. That year-eight rental value he used assumed annual lease payment would be similar to the projections for the seven-year existing lease. He then applied a generous "discount" to acknowledge the small possibility the amount could drop a bit after the current seven-year rental period.

40

Lock's ten-year model, on the other hand, assumed that after the seven years left on the Amended Lease, there would be a steep drop in annual rental value. Lock testified he believed the Amended Lease was substantially "above market." He thus assumed the theater rents would decrease precipitously in years eight through ten of his model. In Lock's model, this dramatic drop in rent received in years eight through ten drove the property resale value down sharply as well. This alone explains most of the reason Lock's valuation is approximately $2,000,000 less than Shaykett's.

The critical difference between the experts' valuations is whether the rent paid under the Amended Lease is near market or substantially above it. This becomes a critical determination in the feasibility of the plan. The Court must therefore determine whether rent under the Amended Lease is at fair market or substantially above market.

### i. The Rent Under the Amended Lease is a Good Approximation of Fair Market Rent

The Court heard a large amount of testimony about whether the Amended Lease was above or at fair market rent. Both experts discussed comparables as an important part of their analysis. The City's expert, Shaykett, relied primarily on a similar movie theater complex in Sioux Falls, South Dakota. Shaykett stated that the Sioux Falls theater was the most comparable movie theater property for a number of reasons. Sioux Falls was in a relatively close geographic market, both

41

theaters were similarly new, both were part of economic development areas in their

locations, and both were leading movie theaters in cities that function as regional

population centers.

Lock did not use any truly comparable movie theater projects.  He used an

older movie theater project with fewer amenities and less draw for movie goers.

He also used other commercial rental properties that were not theaters.  While

Lock had more total comparisons, the Court finds them to be less "comparable."

The Court finds Shaykett's reliance on the Sioux Falls theater to be a good

comparable and good indication of market value.

The Court also particularly takes notice of both the lease history on this

project and the current profitability of Main Street's operation.  The Original Lease

required Main Street to pay approximately $1,200,000 a year.  Civic has spent the

majority of this case arguing that it was entitled to reinstate the Original Lease as

the **only fair** way to approach this case.  Civic has repeatedly argued it is entitled

to at least $3,200,000 of back rent under this Original Lease.  It's Original Plan,

Amended Plan, and even the Second Amended Plan currently before the Court

either rely on, or reserve Civic's right to, both Original Lease payments and back

rent payments.  Never once—until the confirmation hearing—did Civic ever

suggest the Original Lease was above fair market value—let alone significantly

above.

42

Instead, Civic has argued throughout the case that the $900,000 payments under the Amended Lease were unfair—if not grossly unfair. Civic has repeatedly sought to set aside the Amended Lease and its $900,000 annual rent. Civic has consistently argued that it is "inequitable" to stick Civic with the Amended Lease payments. Civic has consistently argued the Bank, the City, and Main Street conspired to trap Civic into this unfairly low Amended Lease payment. Civic has argued that this was such an egregious, inequitable state of affairs that the claims of the Bank and the City should be equitably subordinated in this case. At the confirmation hearing, Civic continued to make these arguments. At the same time, however, Civic/Semingson argued that the Original Lease was way above market—and, in fact, so was the Amended Lease. The Court finds those arguments hard to square.

Civic put on lengthy and very specific testimony from Lock at the confirmation hearing that the Court should not accept this Amended Lease as fair market rent. Civic argued Main Street agreed to pay more than market in the Amended Lease to settle outstanding back rent claims.

The Court finds that this testimony and Civic's supporting arguments flatly contradict the arguments Civic has made throughout the case. Civic has explicitly and repeatedly claimed that the Amended Lease unfairly required Civic to forego all back rent. Not one time did Civic even suggest—until confirmation—that the

43

Amended Lease payment included an attempt to pay back rent. Civic argued just the opposite—it was being deprived unfairly of over $3,200,000 in back rent by the Amended Lease. Civic has asserted equitable subordination arguments in this case and tortious interference counterclaims in an adversary case brought by the Bank—both based entirely on a theory that Civic had been cheated or swindled out of back rent. The Court was surprised, to say the least, when at the confirmation hearing Civic's valuation expert testified that the Amended Lease was significantly **above** market value. The Court finds Civic's explanations about why this is not a change of position to be entirely unpersuasive.

In particular, the Court flatly rejects Civic's suggestion that the $900,000 annual base rent was above market because it was paying off some or all of that "back rent" from the Original Lease. The fact this explanation was offered for the very first time at the confirmation hearing is one of many factors showing this was only an attempt to artificially deflate the valuation of the property. The Court finds this argument lacks credibility and evidentiary support.

Even looking at the evidence and argument in the light most favorable to Civic, the Court finds the parties **may** have mentioned back rent as a minor part of the discussion of rent in the Amended Lease. The weight of the credible evidence much more strongly suggests the Amended Lease reduced the previous rent under the Original Lease mainly to address Main Street's complaint about the building

44

condition, lack of complementary tenants, and failure to get the benefits for which

it bargained.  The owner of Main Street, William Barstow, testified to that effect.

The Court finds his testimony to be credible and persuasive.  The Court finds

testimony to the contrary to be not credible and unpersuasive.

Even the argument eventually made by Semingson's very able counsel—on

behalf of Civic—to address this apparent contradiction contains a gaping hole.

Counsel argued that the back rent, in fact, was made a part of the computation of

the "percentage rent" the Amended Lease described once Main Street's revenue hit

certain levels.  Even taking that argument at face value (in spite of the lack of

evidence to support it and the numerous arguments Civic has made against it

throughout the case), it still provides no real assistance here for Civic's valuation

arguments.  At the very most, it shows that the **percentage** rent could conceivably

have been above market in order to pay back rent.  It does not show in any way,

however, that the **base** rent of $900,000 was above market.  In fact, it suggests the

opposite—that the $900,000 was indeed at market value and it only became above

market value when percentage rent kicked in.

This is not at all what Civic's expert—Lock—stated in his testimony.  Lock

stated the $900,000 annual base rent was far above market.  In fact, he made a

significant downward adjustment in rents for the years after the Amended Lease

expired.  In year eight, the first year after the Amended Lease, Lock believed fair

market value rents would drop to $540,000—not back to the $900,000 base rent

from the higher percentage rents that purportedly pushed the Amended Lease

above fair market value.  In fact, Lock offered no such testimony.  Lock asserted

his belief the $900,000 annual base rent to be far above market value because it—

not percentage rent—was paying off back rent.  Even if negotiations on the

Amended Lease did involve back rent in addition to settling other claims, the

parties still appear to have reached a rent number that was in line with the market.

The Court notes an additional persuasive factor indicating that the Amended

Lease reflects the market.  Main Street's revenues have recently reached levels

where it is paying some percentage rent in addition to its $900,000 base rent.  This

is a strong signal that Main Street is now operating at a sustainable level capable of

supporting that amount of rent and likely continuing to grow steadily in the future.

All of this shows the Original Lease was too high for the deficient space Civic

provided, the Amended Lease with its substantially lower (25% lower) base rent is

a good approximation of fair market value, and that the success Main Street is

having now shows a likelihood of the same or higher future rent.

The Court finds that all the credible evidence shows the Amended Lease is

at or near fair market rent.  The Court finds the rent is not likely to decline steeply

or even decline at all once the Amended Lease ends.  The fact that Main Street has

been able to pay that rent, wants to stay in the space, and its revenue is increasing

46

all support Shaykett's central assumption that the current rents will continue.

Shaykett's estimate is, in fact, probably a little too low as he included a generous

"discount" to account for the chance that rent would not continue.  In short, the

Court finds Shaykett's valuation for the City much more persuasive than Lock's

valuation for Civic.  Stated another way, the Court does not find credible Lock's

assumption that rent will decline sharply after the Amended Lease expires and that

the property value should drop accordingly.

The Court also finds Shaykett's testimony about the value of the vacant

retail space to be more persuasive.  He notes that improving the vacant spaces to a

vanilla shell and dropping the rent to $10 per square foot would result in full

occupancy in 3–4 years.  He noted this would improve the overall financial health

of the project significantly—and much more so than Lock's delayed build outs and

longer absorption period to full occupancy.  While Lock projects higher rent later,

Shaykett persuasively demonstrates that "newer dollars are worth more than future

dollars."

Civic's counsel did point out a number of minor errors in Shaykett's

valuation.  While these errors do not undermine the credibility of his conclusions,

they do necessitate some consideration of minor adjustments to his valuation.  The

Court notes two of the errors in Shaykett's analysis that Civic's counsel

demonstrated should at least be discussed.  First, Civic showed Shaykett

47

miscalculated the overage rent which would be paid in year five of the remaining

seven years under the existing lease.  This error resulted in Civic collecting an

extra $30,000 in revenue each of those years.  While this error could be corrected

by adjusting Shaykett's valuation downward slightly, the Court finds it to be a

"wash" based on Shaykett's testimony explaining this discrepancy and the fact

Shaykett unnecessarily "generously" discounted his calculation of future rents out

of the abundance of caution.

Civic also showed that Shaykett adjusted his initial value downward by only

$290,000 for the necessary repairs to the building.  The evidence showed $600,000

is the amount needed for repairs.  That $600,000, rather than the $290,000, should

be deducted from Shaykett's initial value of $5,680,000.  This results in a property

value (before adding back cash in the tenant improvement reserve account) of

$5,081,845.  The $148,513 of cash in the tenant improvement escrow would be

added to the value of the property because Shaykett assumes it will be spent to

make "vanilla shell" upgrades.  Thus, this amount would also get added back to

determine the proper value of the Promenade property.  Shaykett's valuation

(properly modified) is $5,230,358.

The Court notes that Shaykett's valuation is also supported by a pre-petition

offer Main Street made to purchase the Promenade property from Civic.  Main

Street offered to purchase the property pre-petition for $4.75 million.  This offer

included loan forgiveness by the City and the Bank that pushed its value to Civic to

equate to an offer of over $6,000,000.  Civic rejected that offer as insufficient.

Since that time, Main Street's rent has increased to the higher percentage rent

based on Main Street's increasing sales.  That would only indicate that the value of

the property has been increasing steadily since the time of the offer.

In reaching this decision on valuation, the Court has rejected the Bank's

position that the cost of all the necessary repairs to the Promenade property should

not be subtracted from the valuation.  The Bank had argued Civic's conduct caused

or contributed to the decline in value of the Bank's collateral, and Civic should get

no benefit from its own neglect.  The Court finds this position to be without merit

because the Bank's claim is only secured up to the value of its collateral.  The

value of the collateral, even under its own expert's methodology, requires the

deduction in price for repairs that are required.  Thus, the Court concludes the

value of the Promenade property is $5,230,358.

### b.    Effect of Civic's Post-Petition, Pre-Confirmation Payments to the Bank

The Bank has received post-petition payments from Civic because of the

Bank's secured position.  There have been two possible sources identified for the

Bank's entitlement to those payments.  The first is the Bank's undisputed security

interest in Civic's rents and proceeds, which continues post-petition under

§ 552(b).  The other is the payments that the Code allows undersecured creditors to

receive in "single asset real estate" cases to keep the automatic stay against secured

creditors in place.  11 U.S.C. § 362(d)(3) (2012).  While there is some dispute

whether the source of those payments is important, the most significant dispute by

far is about the effect of those payments on the amount of the Bank's secured and

unsecured claims—and thus the amount Civic must pay in full.

### i.   Payments Under § 362(d)(3) in Single-Asset Real Estate Cases

Civic purportedly made some or all of these post-petition, pre-confirmation

payments to the Bank under § 362(d)(3).  Civic and the Bank treat this case and

these payments as required for a "single asset real estate case."  (First National

Bank's Objection to Confirmation, ECF Doc. No. 289, pp. 2, 21–22; Debtor's

Mem. in Support of Confirmation, ECF Doc. No. 294, pp. ii, 15, 27.).  The City

has noted Civic's duty to make payments under § 362(d)(3), but argues that these

payments should have been higher.

It should be noted that no party has ever brought a motion to determine

whether this is a "single asset real estate" case.  This Court has not ruled on this

issue.  Civic's petition also did not identify it as such a case and Civic did not

check the "Single Asset Real Estate" box when identifying the case type.  Even so,

Civic has been making the post-petition, pre-confirmation payments at least

"ostensibly to comply with the requirements of 11 U.S.C. § 362(d)(3)(B)." (First

National Bank's Objection to Confirmation, ECF Doc. No. 289, p. 2).  Civic states

50

that it has made payments and "complied with its obligations under 11 U.S.C.

§ 362(d)(3)." (Civic's Mem. in Support of Confirmation, ECF Doc. No. 294, pp. 3,

28).  The City argues that Civic has paid "substantially less than required" under

§ 362(d)(3) but appears to acknowledge that these "single asset real estate"

payments are required in some amount.  To determine the effect of § 362(d)(3)

payments, the Court reviews its requirements and purpose.

In a single asset real estate case, a debtor must quickly file a feasible plan or

begin making payments of interest to the secured creditor at the contract rate.  11

U.S.C. § 362(d)(3).  Payments under § 362(d)(3) differ from adequate protection

payments under § 362(d)(1).  The single asset real estate payments are not limited

to compensating a secured creditor for the decline in the value of its collateral by a

debtor's continued use of the collateral or the delay in foreclosure.  See In re

Heather Apartments Ltd. P'ship., 366 B.R. 45, 49–50 & 50 n.6 (Bankr. D. Minn.

2007).  "As the Supreme Court explained in Timbers, [§ 362(d)(1)] adequate

protection payments cannot be used to compensate the creditor for lost interest or

to provide lost opportunity costs."  First Fed. Bank of Cal. v. Weinstein, 227 B.R.

284, 296 (B.A.P. 9th Cir. 1998) (citing Timbers, 484 U.S. 365 (1988)).

In contrast, § 362(d)(3), which was enacted after Timbers and subsequently

amended in BAPCPA, does compensate secured creditors for the use of their

collateral.  See generally In re Club Golf Partners, L.P., No. 07-40096, 2007 WL

1176010 (E.D. Tex. Feb. 15, 2007) (providing history of original enactment of

362(d)(3) in 1994 and subsequent amendments).  One case noted:

> The legislative history for § 362(d)(3) is "meager."  In re Archway
> Apts., Ltd., 206 B.R. 463, 465 (Bankr. M.D. Tenn. 1997).  However,
> the terse extant history and the statute's own structure suggest that
> Congress was concerned about the relative unfairness of lengthy delay
> in Chapter 11 cases involving single-asset real estate projects, In re
> LDN Corp., 191 B.R. at 326; that one of its goals aims to expedite the
> proposal of meritorious plans of reorganization in such cases, In re
> Kkemko, Inc., 181 B.R. at 49; and that, where the case does not early
> kick forward toward confirmation, a debtor must compensate its
> mortgagee for the time-value of the mortgagee's debt investment, by
> the payment of interest at the original contractual rate.[6]

> > FN6:  The third conclusion does not bear a case citation
> > here, the published jurisprudence under § 362(d)(3) being
> > almost as sparse as the legislative history.  However, this
> > point is the only one reasonably to be drawn from the
> > language of the alternative under § 362(d)(3)(B).

In re Heather Apartments, 366 B.R. at 49–50 & 50 n.6.  In other words, it appears

that § 362(d)(3) in many ways provides to undersecured creditors in a single asset

real estate case what Timbers disallowed under 362(d)(1)—the payment of interest

as compensation for the continued use of collateral.

Civic consensually agreed to make post-petition § 362(d)(3) payments.  To

do so, Civic has continued paying the Bank a portion of the post-petition rents it

has received.  The Bank consented to this amount of payment.  The Bank never

requested the Court to order more.  The City, however, now argues Civic should

have paid more.  The City also argues the lack of previous court approval for these

payments makes the amount paid "unauthorized."  The Court can only reconcile

these positions by concluding the City wants Civic's § 362(d)(3) payments to be

retroactively increased to either pay down the Bank's claim or pay some of the

City's claim.

In response, Civic notes it "is unaware of any requirement that the amount of

its § 362(d)(3) payments need to be approved by the Court."  (Civic's Mem. in

Support of Confirmation, ECF Doc. No. 294, p. 28.)  Civic also suggests that "as a

wholly unsecured creditor, the City is not entitled to any payments under

§ 362(d)(3)."  (ECF Doc. No. 294, p. 28.)  Finally, Civic argues that if anything,

Civic has paid more than required.  Civic states its § 362(d)(3) payments were

calculated assuming a property value of $4.75 million, and its expert offered a

substantially lower valuation.

The Court declines the City's request to revisit the amount of payments that

Civic should have made.  Civic and the Bank agreed to an amount to satisfy

§ 362(d)(3).  The City could have bought a motion for relief earlier in the case if it

wanted to challenge this payment.  The Court also rejects any argument by the City

that the payments are "unauthorized."  The consensual agreement between the

Bank and Civic was sufficient authority unless and until a party filed a motion

under § 362(d)(3) challenging the amounts being paid.  Again, the City could have

53

addressed this issue much earlier in the case if it wanted a Court finding that authorized and/or increased the payments.

### ii. Payments Made Do Not Reduce the Bank's Secured Claim

The amount of the payment is not an issue.  Neither is the authority for payments.  In addition to § 362(d)(3), there is no dispute that the Bank also has a security interest in post-petition rents in this case under § 552(b).  The only question Civic raises therefore is whether Civic's payments should be applied to the Bank's secured claim.

To be clear, to resolve this issue, the Court need not determine which statute, § 362(d)(3) or § 552(b), authorized the payments.  In re South Side House, LLC, 474 B.R. 391, 417–18 (Bankr. E.D.N.Y. 2012).  In South Side House, the court noted that in a single asset real estate case "there is no practical difference between how payments . . . under Section 362(d)(3) and adequate protection payments [on creditors cash collateral protected by § 552(b)] should be applied."  Id.  A short discussions of § 552(b) demonstrates why this is so.

Normally, all property acquired by a debtor post-petition (such as the rents) become property of the estate.  See 11 U.S.C. § 1115 (2012).  That property is not subject to an existing security interest unless it falls under the exception in § 552(b).  Id. § 552.  The exception in § 552(b) allows a pre-petition security interest of a creditor in property that extended to "proceeds, products, offspring, or

54

profits of such property" (such as the rents) to continue in these rents/property

post-petition.  Id. § 552(b).

The Bank has a security interest under § 552(b) in post-petition rents, which

would provide enough authority on its own for the post-petition payments.  The

dispute here is whether those payments reduced the Bank's secured claim or

unsecured claim.  That issue has great significance in this case.  If the payments

reduced the Bank's secured claim, the amount Civic must pay in full to the Bank in

the Plan decreases—making the Plan more feasible.  If the payments did not

reduce the Bank's secured claim, there is no such reduction in what Civic must

pay—making the Plan even less feasible.

The Bank argues the secured portion of its claim was not reduced by Civic's

post-petition payments of those rents.  Instead, it argues that the payments reduced

only its overall claim value—leaving the secured portion unaffected in the end.

The Bank relies on In re South Side House, L.L.C., 474 B.R. 391 (Bankr. E.D.N.Y.

2012), and the line of cases it represents.  There, the court stated that "payments

from rents should not reduce the secured portion of a creditor's claim in the first

instance, because of the creditor's separate security interest in those rents under

Section 552(b)."  Id. at 415.  Instead, the court found accruing rents would

represent additional collateral, which is essentially adding to the portion of the

claim treated as a secured claim.  Id.  "Taken together, sections 506(a) and 552(b)

55

require that the creditor's post-petition security interest in rents be added to its separate security interest in the property." Id. (quoting In re Bloomingdale Partners, 155 B.R. 961, 976 (Bankr. N.D. Ill. 1993)).  Under the approach in South Side House, the post-petition rents would increase the Bank's total secured claim when they were paid to Civic, and then drop the value of the secured claim back down when the rents were paid over.  This pays down the Bank's overall claim, but ends in a wash with regard to the secured claim.  It increases the secured claim temporarily then reduces the secured claim by that payment of the rents.  The net effect reduces the unsecured portion of the claim by paying down the overall value of the claim while the value of the secured claim is unchanged.

Civic disagrees.  It argues that all post-petition payments it made to the Bank should be subtracted first from the Bank's secured claim.  Civic relies on In re Kalian, 169 B.R. 503 (Bankr. D.R.I. 1994), and the cases following its rule.  There, the court concluded that an assignment of rents does not provide a separate source of collateral that can accrue value for the secured claim post-petition.  Id. at 507. Instead, these cases find the secured portion is fixed and cannot increase after the petition is filed.  Thus, the post-petition payments from those rents (security) should be applied first to reduce the amount of the secured claim.  Id. at 507.  Civic asserts that both Kalian and the Supreme Court's decision in Timbers (upon which Kalian relied) hold that a creditor's secured claim must be reduced when paid from

56

post-petition rents.   In this case, Civic's position is that the value of the Bank's

secured claim is fixed at the petition date and § 552(b) is just an alternative method

to pay down that fixed secured claim.

Civic also argues that if the Bank received the post-petition rents as security

in addition to the collateral value of its property, it would amount to paying the

Bank's unsecured claim in front of other unsecured creditors.  Civic and <u>Kalian</u>

rely on specific language from <u>Timbers</u>, where the Supreme Court said in dicta:

"Section 552(b) therefore makes possession of a perfected security interest in post-

petition rents or profits from collateral a condition of having them applied to

**satisfying the claim of the secured creditor ahead of the claims of unsecured**

**creditors**."  <u>Timbers</u>, 484 U.S. at 374 (emphasis added).  The question this

language presented is what the Supreme Court meant by "satisfying the claim of

the secured creditor."

This highlighted language from <u>Timbers</u> produced a large split in cases—

some that add the post-petition rents to the secured claim, thereby reducing the

creditor's total claim from its unsecured portion first, and some that subtract those

payments from the secured claim, thereby reducing it before the unsecured portion

is affected.  <u>See</u> <u>Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship</u>, 248 B.R. 668, 685–

86 (D. Mass. 2000) (noting a split of authority between "addition" and

"subtraction" cases); <u>see also</u> <u>In re Old Colony, LLC</u>, 476 B.R. 1, 26–28 (Bankr.

57

D. Mass. 2012)(same); <u>In re Machinery, Inc.</u>, 287 B.R. 755, 762–66 (Bankr. E.D.

Mo. 2002)(same).  The courts that have allowed "addition" have interpreted the

relevant <u>Timbers</u> language—"claim of the secured creditor"—to mean the whole

claim of such creditor, including both the secured and unsecured portions.  <u>Beal</u>

<u>Bank</u>, 248 B.R. at 685.  The courts that have allowed "subtraction" have held that

language to mean the secured claim of the secured creditor is fixed on the petition

date and thus, all post-petition payments on it are subtracted from that fixed

secured claim.  <u>Id.</u> at 685–86.

This Court finds that the "addition" cases are not only the clear "majority

trend" but also the better reasoned cases.  <u>See</u> <u>In re Old Colony</u>, 476 B.R. at 26.

As another bankruptcy court in this circuit observed:

> A debtor in possession is already required under the absolute priority
> rule, 11 U.S.C. § 1129(b)(2)(C)(ii), to pay the secured claims before it
> pays the unsecured claims regardless of whether the secured creditor
> has complied with the provisions of § 552(b)(1).  Thus, Debtor's
> interpretation of the Supreme Court's <u>dicta</u> would render § 552(b)(1)
> superfluous in a Chapter 11.  Therefore, a much more natural reading
> of the Supreme Court's dicta in <u>Timbers</u> is that if the creditor has a
> valid security interest in post-petition proceeds under § 552(b)(1), the
> value of its secured claim includes those proceeds.    <u>Homestead</u>
> <u>Partners</u>, 200 B.R. at 280–81; <u>Union Meeting Partners</u>, 178 B.R. at
> 676; <u>Bloomingdale Partners</u>, 155 B.R. at 976.

<u>In re Machinery</u>, 287 B.R. at 765 (emphasis original).

The basic principles governing claims and collateral valuation further

support the "addition" analysis.  The beginning point for determining the value of a

secured claim is the amount of the creditor's "**allowed claim**".  11 U.S.C. § 506(a)

(2012) (emphasis added).  The creditor's allowed claim secured by a lien on estate

property "is a secured claim to the extent of such creditor's interest" in the estate's

interest in the property.  Id.  An allowed claim "is an unsecured claim to the extent

that the value of such creditor's interest . . . is less than the amount of such **allowed**

**claim**."  Id. (emphasis added).

The amount of the creditor's allowed claim is generally measured as of the

petition date.  Id. § 502.  The amount of the secured claim is not fixed at or pegged

to any particular time.  It is determined by comparing the amount of the allowed

claim to the "value of the collateral."  In re South Side House, 474 B.R. at 413

(quoting Timbers, 484 U.S. at 372).  That collateral valuation can happen at a

variety of times during the case—and often at confirmation.  Id.  Thus, the secured

portion of an allowed claim is fixed at that point in time.

This Court agrees in particular with the reasoning of Beal Bank, 248 B.R. at

685.  The district court in that case found that Timbers does not prohibit an

undersecured creditor from obtaining § 552 rents to add to its secured claim

(essentially receiving additional principal).  Id.  Timbers, instead, merely limits an

undersecured creditor from obtaining post-petition interest payments.

One rationale for the Timbers holding is particularly helpful here: "It
was considered unfair to allow an undersecured creditor to recover
interest from the estate's **unencumbered** assets before unsecured

> creditors had recovered any principal." <u>Id.</u> at 373, 108 S. Ct. 626 (emphasis added).
>
> In <u>Timbers,</u> the Supreme Court distinguished the undersecured creditor seeking "use value" under § 362 from an undersecured creditor with a "perfected security interest in post-petition rents." <u>Id.</u> at 374, 108 S. Ct. 626. "Section 552(b) of the Code makes possession of a perfected security interest in post-petition rents or profits from collateral a condition of having them applied to satisfying the claim of the secured creditor ahead of the claims of unsecured creditors." <u>Id.</u>

<u>Beal Bank</u>, 248 B.R. at 685. In fact, much of the <u>Timbers</u> opinion was contrasting the treatment of undersecured creditors and unsecured creditors. In context, it appears that when the Supreme Court said "satisfying the claim of the secured creditor ahead of the claims of unsecured creditors," the Court was including fully secured creditors and undersecured creditors under the umbrella of "secured creditors."

For these reasons (and others noted in "addition" cases), this Court concludes that the better reading of <u>Timbers</u> and the Code language supports the "addition" approach. The Court adopts that approach here. In so doing, it finds that the Bank's post-petition security interest in rents under § 552(b) was adding to its collateral, not reducing it.

The fact the post-petition rents were actually paid over to the Bank instead of being held by Civic in a post-petition account that increased in value does not change the analysis. As noted above, <u>South Side House</u> points out that the

payment of the post-petition rents should simply be treated as a return of the

Bank's collateral.  474 B.R. at 415.  Other courts agree:

> [A]ny payment of the post-petition proceeds to the creditor during the pendency is a pre-payment on the secured claim.  In re Union Meeting Partners, 178 B.R. 664, 676–77 (Bankr. E.D. Pa. 1995); In re Bloomingdale Partners, 155 B.R. 961, 976 (Bankr. N.D. Ill. 1993). Thus, the increase in the creditor's claim when the proceeds are generated coupled with the corresponding decrease once Debtor pays the proceeds results in a "wash" so that the value of the secured claim remains constant to the extent that debtor paid the proceeds to the creditor.  Union Partners, 178 B.R. at 664 n. 8; see also Carlson, 15 *Cardozo L. Rev.* at 1379.

In re Machinery, 287 B.R. at 766.  The Bank's secured claim therefore was not

reduced by the value of the post-petition payments received.  The Bank's overall

claim was reduced.  The net result is that the Bank has a smaller unsecured portion

of its claim.

To the extent that Civic has not been paying the Bank the full rents Civic has

received each month, this would add value to the Bank's secured claim.  This

appears to be the case here.  Civic's monthly operating report for March 2013

reflected cash of $274,457.  (ECF Doc. No. 394, p. 3.)  Because that cash came

from rents and is the Bank's cash collateral, it must be added to the Bank's secured

claim.

The Court thus concludes the Bank's collateral has a total value of

$5,504,815.34.  This figure includes the value of the Promenade property

(including the tenant improvement account) and all cash held by Civic (post-

petition rent retained by Civic).  This amount does not include any value for the Bank's claim of an additional security interest in "general intangibles."  The Bank claims its interest in general intangibles includes Civic's contract claims for improper construction or construction defects.  Civic disagrees.

The Court need not decide this issue and/or estimate the value of the general intangibles claim.[4]  The Plan is not feasible because it does not provide enough funds to pay the Bank's secured claim and fulfill Civic's other duties under the Plan.  In particular, the Court finds that Civic's reorganization plan would likely wind up in a future reorganization or liquidation.  See 11 U.S.C. § 1129(a)(11).

### 2.   Problems with Civic's Projected Cash Flow Also Make the Plan Not Feasible

Another reason the Plan is not feasible is that the cash flow projections Civic offers to support the Plan are not credible.  Civic attempts to show it can pay all obligations over the life of the Plan through its cash flow projections.  First and foremost, the projections wrongly show payment of the Bank based on an improperly low valuation of its secured claim.  Civic would have insufficient cash

---

[4] Assuming without deciding that the Bank's security interest in general intangibles would cover the construction defects suits, the Court would normally have to estimate the value of the lawsuits in order to determine the Bank's total allowed secured claim.  See 11 U.S.C. § 502(c)(1) (2012).  Without fully determining the value of the Bank's secured claim, the Court cannot say whether the Bank is an over or undersecured creditor.  Consequently, the Court cannot say definitively whether the City is a secured or unsecured creditor.  However, for purposes of this opinion, the Court assumes without deciding that the Bank is an undersecured creditor.

flow to pay the Bank's claim even if the Court was to find that all other aspects of the cash flow projections were credible. The Court, however, cannot even make such a credibility finding.

At the confirmation hearing, the Court asked, as other courts have, if, in considering the Plan and projections, the Court should view "the past as prologue" here. Counsel for Civic/Semingson argued that the question is not past performance, but instead likelihood for future performance. Past performance is, however, a generally accepted factor to consider in determining the reliability of future projections. In re Am. Consol. Transp., 470 B.R. 478, 490 (Bankr. N.D. Ill. 2012). As noted by Am. Consol. Transp., the Tenth Circuit B.A.P. has specifically stated: "A glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed and the Plan is not feasible." Id. (quoting F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Southwest, Inc.), 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006) (internal quotation marks omitted).

However, as Am. Consol. Transp. also noted:

Yet a debtor's history is not the only factor to be considered. A Fifth Circuit Opinion has noted that "[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible." Matter of T–H New Orleans Ltd. P'ship, 116 F.3d 790, 802 (5th Cir.1997). Debtors are not required to view business and economic prospects in the worst possible light. Id.

63

Id. at 491.  As another court put it:

> Fortunately for the improvement of the human condition (not to
> mention the rehabilitation of financially-troubled businesses), the past
> is not always prologue. On the other hand, both logic and experience
> teach that the past performance of a business venture, while it may not
> be an invariable predictor of future performance, is nevertheless—
> absent some dramatic change in economic conditions, debt structure,
> or business operations—powerful evidence as to a business's future
> viability or profitability. Certainly, it is the most objective evidence.

In re DeLuca, No. 95-11924-AM, 1996 WL 910908 (Bankr. E.D. Va. Apr. 12,

1996).

Applying these standards, the weight of the evidence at the confirmation

hearing demonstrates the past is prologue here—and is a predictor of the future.

The projections offered are more conjectural, hopeful, and speculative than a

credible path forward for Civic.  The projections at best offer a minor alteration in

the way Civic conducts its business and how it believes it can generate income.

The undisputed evidence showed Civic needs to spend significant money

immediately to make the project viable.  That need has been present through the

life of the project.  Civic has not put that value into the project to date.  The cash

flow projections seriously under-value those needs going forward.  Civic needs at

least $600,000 for building repairs to take care of water problems and structural

issues.  Godwin noted these problems need to be fixed immediately or the

problems will cause more damage and result in greater cost in the future.  The

projections simply do not set aside the money needed right now.  Instead, the

64

projections again defer most of the maintenance and repairs.  At the same time, the

deferral does not account for the greater future cost that Godwin testified will be

necessary.  This is essentially no change or at best a minimal change from the

methods that Civic has proposed and utilized throughout the history of the project.

Similarly, there is no realistic projected path forward on the vacant retail

space.  The space still has dirt floors, no ceilings, and most of it has had no

attention from Civic at all.  Civic needs significant additional cash now to "build

out" the vacant space to a standard "vanilla shell" for ready rental.  There was

disagreement at the hearing about the exact build out costs, but the Bank showed

that the most persuasive estimate exceeds $500,000.  That money simply does not

appear in the near-term projections.  Instead, Civic projects building out the vacant

spaces a little at a time with the hope it can generate more rental income down the

road, which in turn could be put towards more build out and repair costs.

The Court finds that Civic's hopes to finance the costs of much of these

improvements by bringing in more future rental is exactly what Civic has proposed

and hoped for throughout the life of the project.  The Court finds that the evidence

shows the build outs and repairs need to occur before the rental income can be

realized and that without that rental income, the project remains exactly where it

has been.

The Court finds the condition of the building and completely unfinished vacant spaces (enclosure only) are the most likely reason the spaces have not rented.  Civic offered no credible evidence to support its projections about future rentals at higher rates.  Civic provided little attention to and almost no evidence to support that a turnaround in rentals and income was realistic.

The Court specifically finds the path projected remains largely unchanged from the unsuccessful operation of the past.  This attempt to delay and defer maintenance and repairs is substantially the same as the previous history of this project.  The hope of future strong rentals is also substantially the same without any real, definitive change in course, management, or capitalization.

Civic's management remains entirely in control under the Plan.  This is the same absentee management that has been in control throughout.  This is the same past course of action with the same actions in place.

Civic's Plan provides for only $150,000 in new value to come into the project.  The Plan and projections also propose using the cash on deposit in the tenant improvement account of $148,000.  Even assuming Civic could use all those funds now (which is entirely unclear from the evidence), that still leaves Civic just shy of $300,000 total in available capital.  To do the repairs and build outs, the cost is likely to exceed $1,000,000.  The projections show nothing close to that amount. The Court finds the projections that rely on the same deferral of build outs and

maintenance are unrealistic.  They simply reflect a hope that what did not work in the past will work in the future—without any new ideas or concepts for how that will happen.

The Court finds and concludes these projections would not allow Civic to pay the Bank on its secured claim, make all critical repairs to the building, and provide even the minimum build outs needed to rent the space.  With so little new value, the Court has concluded Civic will not realistically be successful in reorganizing under the Plan.  The Court specifically finds that the Plan is not feasible.

### 3.    Civic's Continutation of Pre-Petition Management Also Make the Plan Not Feasible

Further, the Plan is not feasible because it calls for Civic to continue operation under the same pre-petition management.  "Whether the same management will continue to operate the company" is a pertinent consideration in feasibility analysis.  In re Clarkson, 767 F.2d 417, 420 (8th Cir. 1985); see also In re Save Our Springs (S.O.S.) Alliance, Inc., 632 F.3d at 173 (citing management continuation as one of the six factors to consider).  The Plan does not suggest any changes in Civic's pre-petition management, which led it to bankruptcy.  This raises serious doubts as to Civic's ability to successfully reorganize under the Plan and is one more reason the Court finds the Plan not feasible.

### B.      Objection to Good Faith Under 11 U.S.C. § 1129(a)(3)

The City also objects to the Plan on the grounds that it was not proposed in

good faith as required by 11 U.S.C. § 1129(a)(3).  While the Court's determination

that the Plan is not feasible is dispositive, the Court will nonetheless briefly

address the good faith arguments.  Section 1129(a)(3) requires that plans be

proposed in good faith, but the Code does not define good faith.  Hanson v. First

Bank of S.D., N.A., 828 F.2d 1310, 1315 (8th Cir. 1987).  "[H]owever, a plan is

considered proposed in good faith 'if there is a reasonable likelihood that the plan

will achieve a result consistent with the standards prescribed under the Code.'"  Id.

at 1315 (citing In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr.

S.D.N.Y. 1984); accord In re White, 41 B.R. 227, 229 (Bankr. M.D. Tenn. 1984)).

The City objects to lack of good faith in particular because "the only claims

[Civic] proposes to pay in full are claims that Mr. Semingson personally

guaranteed."  (ECF Doc. No. 290, at 13).  This Court has previously addressed a

similar issue in In re Nevel Properties Corp., Bankr. No. 09-00415, 2012 WL

528179 (Bankr. N.D. Iowa Feb. 17, 2012); see also In re Riverbend Leasing LLC,

458 B.R. 520, 526–30 (Bankr. S.D. Iowa 2011) (finding no good faith issue with a

Chapter 11 plan that proposed to pay debts that were personally guaranteed by a

non-debtor insider and discussing the situations in which injunctive relief

preventing collection from the non-debtor party is appropriate).  In Nevel, the

68

parties asked this Court to take notice of the personal benefit conferred on an

insider of debtor and asked the Court "to find bad-faith on the totality of the

circumstances."  2012 WL 528179, at *15.  This Court found:  "The fact that [and

insider] might benefit financially if the Plan is successful . . . is not relevant" or at

least not directly relevant to showing "that [debtor's] attempt to reorganize itself—

lacks good faith."  Id.

The Court reaches the same conclusion here.  The Court has also considered

the City's other objections regarding Debtor's lack of good faith and finds them to

be without merit.  While there were additional objections to confirmation under

§ 1129(a), the Court chooses not to address them given the feasibility

determination and the relatively small attention those objections were given at the

confirmation hearing.

### III.  Civic's Attempt to "Cram down" Its Plan Under 11 U.S.C. § 1129(b) Fails for Similar Reasons

Section 1129(b) allows the Court to confirm a plan over the objection of

creditors if:  (1) the plan satisfies all provisions of § 1129(a), except

§ 1129(a)(8)—requiring acceptance of all creditors—and; (2) the plan satisfies the

"cram down" requirements of § 1129(b).  While the Court's finding that the plan is

not feasible under § 1129(a)(11) is dispositive, the Court will address the "cram

down" arguments because they fail for very similar reasons.

69

The Bankruptcy Code has a few statutory protections "to curb the inequities of such reorganization plans being 'crammed down' the throat of secured lenders." In re Windsor on the River, 7 F.3d at 131. Section 1129(b)(2)(A) provides some of those special protections for secured creditors:

> (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by Civic or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

11 U.S.C. § 1129(b)(2)(A)(i)(I)–(II) (2012).

Unsecured creditors whose interests are impaired and who do not accept a plan are also protected under § 1129(b). The "absolute priority rule"—shorthand for the language of 11 U.S.C. § 1129(b)(2)(B)(ii)—provides that unsecured creditors will be paid in full before equity holders receive anything. That rule states:

> [T]he holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which Civic is an individual, Civic may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

Id. § 1129(b)(2)(B)(iii).  "In plain English, the provision bars old equity from receiving any property via a reorganization plan *on account of* its prior equitable ownership when all senior claims class are not paid in full."  In re Hollinger Indus., Inc., 321 B.R. 498, 510 (Bankr. E.D. Ark. 2006) (quoting In re Banger Mall P'ship, 2 F.3d 899, 908 (9th Cir. 1993)).

Civic admits that the Plan fails to satisfy the absolute priority rule.  Civic seeks, however, to apply the uncodified new value exception to the absolute priority rule.  That exception has been applied by many courts over the years to allow equity holders, who normally have a lower priority in payment than unsecured creditors, to retain an equity interest in the new, post-confirmation debtor entity if those equity holders contribute sufficient new value to the reorganization.  In re Union Fin. Serv. Grp., Inc., 303 B.R. 390, 424 (Bankr. E.D. Mo. 1993).

The new value exception was first described by the Supreme Court in Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 121–22 (1939).  In Case, the Supreme Court interpreted the 1899 Bankruptcy Act to allow the exception:

> It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor.  This Court, as we have seen, indicated as much in Northern Pacific Railway Co. v. Boyd, supra, and Kansas City Terminal Ry. Co. v. Central Union Trust Co., supra.  Especially in the latter case did this Court stress the necessity, at times, of seeking new money 'essential to the success of the undertaking' from the old stockholders.[15]  Where that necessity exists and the old stockholders

make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made. But if these conditions are not satisfied the stockholder's participation would run afoul of the ruling of this Court in <u>Kansas City Terminal Ry. Co. v. Central Union Trust Co.</u>, supra, that 'Whenever assessments are demanded, they must be adjusted with the purpose of according to the creditor his full right of priority against the corporate assets, so far as possible in the existing circumstances.' <u>271 U.S. page 456, 46 S. Ct. page 552, 70 L. Ed. 1028</u>. If, however, those conditions we have mentioned are satisfied, the creditor cannot complain that he is not accorded 'his full right of priority against the corporate assets'. If that were not the test, then the creditor's rights could be easily diluted by inadequate contributions by stockholders. To the extent of the inadequacy of their contributions the stockholders would be in precisely the position which this Court said in <u>Northern Pacific Railway Co. v. Boyd</u>, supra, the stockholders there were in, viz., 'in the position of a mortgagor buying at his own sale.' <u>228 U.S. page 504, 33 S. Ct. page 560, 57 L. Ed. 931</u>.

> FN15: This new money was commonly necessary in equity reorganizations not only to provide new working capital but also to pay dissenting creditors. <u>See</u> Weiner, <u>Conflicting Functions of the Upset Price in a Corporate Reorganization</u>, 27 Col. L. Rev. 132.
>
> Like considerations are relevant in reorganizations under s 77B. As stated by the court in <u>In Re Dutch Woodcraft Shops, D.C., 14 F. Supp. 467, 471</u>:
>
>> 'Circumstances may exist where the success of an undertaking requires that new money be furnished and where the former stockholders are the only or most feasible source of the new capital. In such instances, the court may recognize as fair and equitable a plan which includes contributions of new money by stockholders, provided it satisfactorily appears that full recognition has been given to the value of creditors' claims against the property.'

Id. at 121–22 & 121 n.15.

The Plan proposes ownership of Civic's principals to continue under the new value exception through Semingson's $150,000 contribution. The Court therefore must address whether the Plan meets the threshold requirements of § 1129(b) and, if so, whether it can rely on a new value exception.

### A.    The Plan Fails the Threshold Requirements of § 1129(b)

To meet the first threshold requirement applicable to this case of establishing a "cram down" plan, § 1129(b)(2)(A) requires that an undersecured creditor be paid at least the value of the secured portion of its claim. 11 U.S.C. § 1129(b)(2)(A) (2012). Section 1129(b)(2)(A) specifically requires all secured creditors to "receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in such property." Id. The Plan fails to meet this requirement.

This Court has already determined the value of the Bank's secured claim is $5,504,815. The Plan entirely fails to pay the present value of that secured claim over the life of the Plan. The Plan instead treats the Bank's secured claim as significantly smaller and pays substantially less than is required under § 1129(b)(2)(A). Thus, the Plan is not confirmable as a matter of law.

73

For the same reason, the Plan fails the related requirement that it be "fair and equitable." <u>Id.</u> § 1129(b)(1).  That section requires that secured creditors receive the full present value of their secured claim or the Plan cannot be considered "fair and equitable." <u>Id.</u>  As the Plan does not propose to pay the Bank sufficient cash payments on its properly valued secured claims, the Plan is also not confirmable under § 1129(b)(1).

### B.    The Plan Can Not Avoid the Absolute Priority Rule in 11 U.S.C. § 1129(b)(1)(B)(ii) Under the New Value Exception

The "cram down" also fails for an additional reason.  While Civic admits the Plan does not satisfy the absolute priority rule, it relies on the new value exception being applied here.  The Bank and the City first argue there is no new value exception under the Code.  They note that the Supreme Court's most recent decisions discussing new value, refer to the "new value" language in <u>Case</u> as dicta and did not expressly endorse the exception.  <u>See</u> <u>Bank of Am. Nat. Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship</u>, 526 U.S. 434 (1999); <u>Norwest Bank Worthington v. Ahlers</u>, 485 U.S. 197 (1988).  They also point out that there is no language in the Code that even hints at such an exception.

The Court need not definitely decide the application of the "new value" exception here.  <u>See</u> <u>In re Lumber Exchange Bldg., Ltd. P'ship</u>, 968 F.2d 647, 650 (8th Cir. 1992) (declining to address "the viability of the new value exception").  Even assuming the new value exception applied, the Court concludes the proposed

74

$150,000 of new value proposed is entirely insufficient. As noted above, the

additional $150,000 would not even begin to cover the cost of repair and work

needed immediately. The contribution certainly will not cover those costs plus the

costs of paying the Bank's secured claim, which are, based on this Court's

conclusion, significantly higher than the Plan proposes to pay. In short, the Plan

simply cannot be confirmed without a much greater infusion of capital, whether the

new value exception applies or not.

## IV.   Equitable Subordination Claims

As noted, all the Plans offered by Civic throughout the case and the one

currently before the Court, call for equitable subordination of the Bank's and

City's claims. The Court ruled at the close of the evidence that those equitable

subordination claims have no merit and no support in the record's evidence. The

Court now incorporates that ruling here and makes it final.

## V.   Post-Hearing Modifications

The Court also rejects Civic's "non-material" modifications to the Plan

offered a week after the confirmation hearing. Civic asserts § 2237(a) allows it to

"modify such plan at any time before confirmation" and "the plan as modified

becomes the plan." While Civic properly recites the statutory language, it misses

crucial points. First, neither § 1127(a) nor the Bankruptcy Rules allow a plan

payment to modify the plan after the confirmation hearing **and** allow the plan

proponent to assert that the previously held confirmation hearing suffices for the

modified plan.  That is exactly what Civic attempts to do without citing any

supporting authority.

Civic relies on a "plain meaning" of the language in § 1129(a), but that plain

language does not address whether Civic can make the modifications after the

hearing but rely on the hearing to support the modifications.  In fact, Civic's

arguments bounce over the language of the accompanying Bankruptcy Rule:  Rule

3019(a).  The rule states, "after a plan has been **accepted** and before its

confirmation, the proponent may file a modification of the plan."  Fed. R. Bankr.

P. 3019(a) (emphasis added).  Here, the plan has not been "accepted."  If

"accepted", and Rule 3019(a) means only some creditors have accepted the plan,

the remainder of the Rule discloses that it is limited in its reach only to accepting

creditors.  Id.

Civic's modification here addresses the claims of creditors rejecting the

Plan.  The only language in the Code or Rules addressing the effect of modification

on creditor's rejecting the Plan simply says:

> Any holder of a claim . . . that has . . . rejected a plan is deemed to
> have . . . rejected . . . such plan as modified, unless . . . such holder
> changes such holder's previous . . . rejection.

11 U.S.C. § 1127(d).

76

Here, none of the rejecting creditors have now accepted the modification.

Thus, the modification, at best, leaves the case exactly where it was before and

during the confirmation hearing.  The Code and Rules do not say or even suggest

that the prior confirmation hearing can be deemed sufficient to support

confirmation of the modified plan over the objections of rejecting claim holders.

This Court instead adopts the following reasoning from In re Griswold

Bldg., LLC, 420 B.R. 666, 710 (Bankr. E.D. Mich. 2009):

> [t]he Court considers it improper to file another amended plan *after*
> the Court has conducted a five-day trial, plowed through mountains of
> briefs, listed to numerous witnesses, inspected numerous documents,
> and has taken the Debtors' request for confirmation of that plan and
> the Lender's objections to it under advisement. Once the confirmation
> hearing was brought to a close, the Court's task is to rule upon the
> Debtors' request for confirmation and the Lender's objections to it.
> The Court's ruling should not have to hit a moving target.

This conclusion applies squarely to this case.

Furthermore, to be clear, a number of those proposed modifications would

require additional testimony or evidence to support their credibility.  For example,

the statement in the modification that Semingson would contribute an additional

$150,000 on the second and third anniversaries of the effective date of the Plan is

not evidence of new value.  Moreover, such an assertion requires explanation of

the details like:  the assurances of performance that he could offer, whether there is

anything tangible that would make this promise "money or money's worth,"

whether money will be held in new or some equivalent set-aside account, whether

77

he still has the financial ability to fund this contribution, and whether the contribution will be made even if he thinks the Plan may fail or has not succeeded as he hoped at those new contribution points. The new supporting projections would need further explanation as well to show the feasibility of the Plan with that additional capital at those points in time. This is especially true regarding the repairs and rental build outs. The Court has found the case needs more capital than the $450,000 total Civic now proposes. Another factual question that arises is how much more repair costs would increase with delays as Godwin indicated when he testified. Civic would need to show those facts are accounted for in the modified projections. At a minimum, the objecting creditors would be entitled to cross-examine Semingson on the particulars of the additional value, a Civic representative, like Ms. LaRuffa, on the supportability of the new projections, and the proposed "new" property manager on what, if anything, he would do differently.

In reaching these conclusions, the Court also notes that all of these "new" changes could and should have been offered well before the confirmation hearing. This case has been pending a long time. There have been several modifications and amendments to the various plans Civic has proposed. It is too simply too late in the game to change direction after the confirmation hearing. See, e.g., In re ASARCO LLC, 420 B.R. 314, 343–44 (S.D. Tex. 2009) (no unlimited right to

78

modify); In re Mid-State Raceway, Inc., 343 B.R. 21, 31–32 (Bankr. N.D.N.Y.

2006) (warning that right to modify is not unlimited and warning against

"gamesmanship").

Plan proponents are simply not entitled, as Civic/Semingson suggests, to

initially put forth a Plan that is favorable to the proponent, take it to a final

confirmation hearing, gauge the Court's reaction or see how their evidence came

into the record, and then modify in important ways to address any deficiencies

revealed.  See In re Mid-States Raceway, 343 B.R. at 31–32 (warning against

gamesmanship).  While a modification after confirmation hearing that gets creditor

approval may be very different (like a post-hearing settlement), that is not the case

here.  Basic fairness dictates that rejecting parties have a chance to determine what

the proposed modifications actually mean, to test the evidence in support of them,

and offer their own evidence against them.

With all that said, even if the Court accepted the proposed modifications and

assumed they could be supported by evidence already in the record, they have been

rendered insufficient on their face by the Court's findings about the value of the

Bank's secured claim.  The Modified Plan and projections specifically state that

they only support a valuation of the Bank's secured claim at $4,900,000, **minus**

payments already made to the Bank.  The Court has found a $5,500,000 valuation

with no deductions for those payments made.  Thus, the modifications fail on their face because they do not make the Plan feasible.

**WHEREFORE,** the objections to Debtor's Second Amended Chapter 11 Plan are **SUSTAINED** and confirmation of Debtor's Second Amended and Substituted Plan of Reorganization is **DENIED**.

Dated and Entered: October 7, 2013

_____

**THAD J. COLLINS, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT**